# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                       ) | CRIM NO. 19–mj–00264-GMH |
| ) | |
| TRICIA STEELE BOUTROS,    ) | |
| ) | |
|     Defendant.        ) | |
| ) | |

## RESPONSE IN OPPOSITION TO THE
## GOVERNMENT'S MOTION TO REVOKE RELEASE

Defendant Tricia Steele Boutros, by and through her attorneys, respectfully responds and opposes the government's motion to revoke release (ECF No. 10). Ms. Boutros respectfully opposes the government's motion because the government has not (1) shown probable cause to believe that Ms. Boutros has committed a Federal, State, or local crime while on release, or (2) provided clear and convincing evidence that she has otherwise violated any other condition of release. *See* 18 U.S.C. §3148(b)(1).

Regarding the government's allegations that Ms. Boutros participated in a fraudulent scheme to steal $29,000 from J.S., defense counsel has learned through late-breaking discovery that the government's account of how J.S. was allegedly defrauded—by hackers who compromised J.S.'s computer and sent unauthorized wires, as stated in the government's motion—is incorrect. The government's account in its motion, which was understandably based on J.S.'s account to the FBI, has now been contradicted by phone recordings of J.S. himself provided by the government just this week, including some recordings provided just yesterday.

Regarding the government's allegations regarding transactions over $1,000, the government has identified transfers among accounts owned by Ms. Boutros. It has not identified

any funds leaving the possession of Ms. Boutros. Such self-transfers should not be viewed as "transactions" under either the letter or the spirit of the Court's order.

Ms. Boutros has taken the Court's conditions of release seriously since they were imposed by the Court on October 28, 2019. *See* ECF No. 9. Ms. Boutros voluntarily surrendered to the FBI on the morning of October 28, 2019. She has reported regularly to Pre-Trial Services.[1] Undersigned counsel understands that Ms. Boutros has passed all weekly drug tests (at least six total) since her release. She also voluntarily appeared at the hearing before this Court on November 25, 2019.

### WIRE TRANSFER FROM J.S.'S ACCOUNT TO MS. BOUTROS'S ACCOUNT

The government's main argument in seeking the revocation of Ms. Boutros's release is that Ms. Boutros allegedly participated in a scheme to fraudulently obtain funds from the bank account of J.S., and specifically $29,000 through a wire transfer from J.S. to Ms. Boutros. Ms. Boutros maintains that she received the $29,000 as part of a legitimate transaction, a transaction she maintains she entered into prior to the Court's release order precluding her from engaging in transactions over $1,000.

The government's allegation as stated in its motion is based mainly on the fact that a wire transfer was made from J.S.'s account to Ms. Boutros's account, that J.S.'s account was hacked and the wire was sent without his knowledge, and that J.S. later reported that the wire was made without his authorization. *See* ECF No. 10 at 2 (hereinafter, "Mot."). The government has

---

[1] As reviewed at the hearing before this Court on November 25, 2019, Ms. Boutros inadvertently missed one weekly check-in with Pretrial Services on Wednesday, November 6, 2019, because she misunderstood the instructions given to her at her first appointment with Pretrial Services on October 29, 2019, and believed that she was required to report for *both* her weekly check-in and her weekly drug test at the same location on Tuesdays. In actuality, Pretrial Services expected her to report for drug testing on Tuesdays and a separate check-in at a different location on Wednesdays. Since that mistake, she has attended all scheduled appointments and drug tests.

2

presented no evidence, and does not contend, that Ms. Boutros herself hacked into J.S.'s computer or personally effectuated the wire transfer. Moreover, it is now apparent based on discovery provided by the government *after* its motion was filed (and after the hearing on November 25, 2019), that the wire in question was not sent as a result of a computer hack and that J.S. *himself authorized the wire*. In other words, the government's own explanation that unidentified males (not Ms. Boutros[2]) surreptitiously gained access to J.S.'s computer and stole information about J.S.'s Charles Schwab account and then sent unauthorized wire transfers without J.S.'s knowledge is simply untrue.

Specifically, the government alleges in its motion that, after agreeing to pay for an ostensible software update, "J.S. provided information about his computer to a man on the phone for the purported installation. J.S. maintained information about his Charles Schwab account on his computer." Mot. at 2. The government's motion goes on to state that J.S. later "noticed three unauthorized wire transfers from his Charles Schwab account." *Id.*

Presumably, these allegations are based on statements that J.S. made to the FBI during an interview on November 7, 2019. In its memorandum summarizing J.S.'s statement, the interviewing agent reports that J.S. told him that J.S. "maintained information on his computer related to his CHARLES SCHWAB bank account," and that J.S. "provided [the callers] with information, which enabled them to *hack into his computer*." Ex. 1 at 1 (emphasis added). The memorandum goes on to state that J.S. later "noticed that there were unauthorized wire transfers from his CHARLES SCHWAB bank account." *Id.*

---

[2] The government has provided no evidence or theory as to the identities of the two males who allegedly called J.S. or how Ms. Boutros is linked to either of them.

New evidence, however, including recorded phone calls of J.S. himself, now show that these statements and allegations are incorrect. Based on recent discovery provided to defense counsel, it is now apparent that no "hacking" ever took place at all. Specifically, in recorded phone calls provided by the government this week,[3] J.S. makes statements indicating that authorized the wire transfers himself, including the wire transfer of $29,000 to Ms. Boutros, and that the wire transfers were not effectuated through a computer hack. Nor did J.S. "notice" unauthorized wire transfers later, as he had stated to the FBI—he himself had authorized them.

For example, on October 30, 2019, the same date when the $29,000 wire was sent to Ms. Boutros, J.S. called Charles Schwab to discuss that very same wire with a Charles Schwab representative.[4] His concern on the call, however, was not that the wire was sent without his permission. Rather, he called Charles Schwab because he mistakenly sent the wire transfer from the wrong account. Specifically, he stated: "I wanted to transfer $29,000 from my investor checking," but he explained that he mistakenly transferred it from his "inherited IRA."[5] Moreover, he explained to the representative that the reason he wanted to switch the account from which he sent the wire is that he was concerned that he would be taxed on the withdrawal from the IRA. When told by the Charles Schwab representative that the wire had already gone through, J.S. asked: "I'm gonna be taxed on $29,000 next year, is that what you're saying?" Finally, on the same call, the Charles Schwab representative names Ms. Boutros as the recipient

---

[3] Defense counsel understands that the government obtained the recordings this week as well and provided them to defense counsel promptly.
[4] The government has informed defense counsel that it agrees that the caller in the recordings is J.S. Further, the person on the calls provides the Schwab representatives with personal identifying information, including his birth date, his age, his social security number, his secret word for accessing his account, his account numbers, his employment status, and how long he has been a client of Charles Schwab.
[5] Defense counsel will provide the recordings of the phone calls if the Court wishes to hear them.

of the wire and informs J.S. that the only way they can reverse the wire is if Ms. Boutros agrees to pull the wire transfer back. J.S. is then heard apparently speaking to another party on another line to see if they will agree to allow the wire to be pulled back.[6] J.S. then reiterates his intention to send the wire to Ms. Boutros, stating to the Charles Schwab representative: "If you get that money, if you get that money back [into his IRA account], I'd like to make the same transfer out of, um, investor checking account," in other words, he wanted to do the wire transfer *again* from a different account. He then says again: "If [the $29,000 wire from his IRA] comes back in, when it comes back in, transfer the other twenty . . . that amount out of my investor checking." J.S. gave no indication that the wire transfer was fraudulent.

      J.S. also called Charles Schwab the next day, on October 31, 2019. In that call, J.S. told the Charles Schwab representative that he sent the wire transfer: "I made a uh wire transfer yesterday and I put in a recall for it yesterday." When asked to explain the reason for the recall, J.S. reiterated that "[i]t came out of the wrong account. I meant, I meant to do it out of my um investor checking account," again referring to the fact that he inadvertently sent the wire out of his IRA account. J.S. again gave no indication on this call that the wire transfer went to the wrong recipient or was fraudulent.

      J.S. then called Charles Schwab a second time on October 31, 2019, this time confirming that he himself effectuated a $24,000 wire transfer to Bank of China, another transaction that the government has alleged was fraudulently sent. Specifically, J.S. stated at the beginning of the call: "I'm confirming a wire transfer." After the representative identifies the wire, J.S. then confirmed that the amount of the wire is $24,000 and that it should have gone to Bank of China.

---

[6] J.S. can be heard stating the name "Tricia" to the party on the other line but there has been no allegation that J.S. spoke to Ms. Boutros about pulling back the wire; rather, J.S. only mentioned he spoke with two males.

With undeniable proof that J.S. incorrectly told the FBI that he had been hacked, the government's theory now appears to be that J.S. agreed and authorized wire transfers himself at the request or insistence of one or more male callers to pay for software or a software update for his computer.[7] In fact, in an FBI interview memorandum drafted before the government's motion, Emily Stevenson, a Charles Schwab internal investigator conveyed that J.S. was told by an unknown caller that he needed to pay for virus protection for his computer. *See* Ex. 2 at 1. Ms. Stevenson further reported that J.S. then gave into the caller's claims and agreed to make three wire transfers, which defense counsel understands total approximately $58,000,[8] "for the ostensible purpose of virus protection." *Id.* The government does not address this inconsistent statement in its motion. Moreover, the fact that J.S. would agree to pay $58,000 for virus protection, however, is simply too farfetched to be believed. Yet, that is the only way the government's theory makes sense.

As to the wire transfer at issue, Ms. Boutros does not dispute that she received a wire transfer in the amount of $29,000 into her Charles Schwab checking account ending -6740 on October 30, 2019. She also does not dispute that Charles Schwab unilaterally reversed the wire

---

[7] At approximately 6:35 p.m. today, on the date that Ms. Boutros's response to the motion to revoke is due, the government served approximately fifty pages of additional discovery on defense counsel, including two additional memoranda summarizing additional interviews of J.S. by the FBI on December 3 and 4, 2019, *after the government had received the recordings* in which J.S. contradicted his prior statement. Given their late delivery, counsel has been unable to fully analyze the memoranda or other discovery or discuss the contents with their client. Ms. Boutros does not waive the ability to address this additional discovery either before or at the hearing on December 9, 2019. In any event, the statements summarized in the interview memoranda do not explain the inconsistencies between J.S.'s original interview and the phone recordings.

[8] Ms. Stevenson's interview memorandum states that J.S. sent three wire transfers and states that two of them were in the amounts of $29,000, and $5,000. *Id.* at 1. The memorandum does not state how much the third transfer was, but the recorded phone calls of J.S. include a statement by him that the third wire transfer to Bank of China was for $24,000.

transfer on November 7, 2019, before consulting her about the circumstances of the transaction. The government, however, has pointed to no other evidence that Ms. Boutros caused or directly participated in causing the wire transfer from J.S. In fact, Ms. Boutros maintains that she understood that she received the wire transfer as part of a legitimate financial transaction on an investment platform called Paxos. Indeed, Ms. Boutros highlights that she transferred a total of $30,000 from her Charles Schwab brokerage account to her Paxos account prior to the wire at issue on October 25, 2019, and prior to the Court's order imposing conditions of release, by initiating two wire transfers in the amounts of $14,000 and $16,000. *See* Ex. 3.

      The government also attempts to rely on certain communications Ms. Boutros had with Charles Schwab after the $29,000 wire transfer was reversed. These communications, however, only serve to support Ms. Boutros's understanding that the receipt of $29,000 was the result of a legitimate transaction. For example, following the reversal of the $29,000 wire transfer, Ms. Boutros affirmatively reached out to Charles Schwab herself to dispute the reversal. Ms. Boutros told the Charles Schwab representative that she had received the $29,000 "in exchange for property." The government flatly characterizes this statement as false without further comment. This statement, however, is consistent with a legitimate financial or investment transaction where the investment is property. "Property" in this context is not limited to real property like a house. Just because Ms. Boutros declined to share the private details of the transaction does not suggest Ms. Boutros's statement was false.

**TRANSFERS EXCEEDING $1,000**

      The government also cites several transfers of money among accounts owned by Ms. Boutros made after Ms. Boutros's appearance before the Court on October 28, 2019, and argues that these are financial transactions over $1,000 conducted by Ms. Boutros in violation of the

Court's conditions of release. Specifically, the government cites (1) three transfers on October 31, 2019, of $10,000, $49,000, and $50,000 from Ms. Boutros's Charles Schwab checking account to Ms. Boutros's Charles Schwab brokerage account and (2) transfers of $7,550, $5,000, $4,500, $3,000, and $4,000 made between October 29, 2019, and November 4, 2019, between Ms. Boutros's Charles Schwab brokerage account to Ms. Boutros's account at Paxos Trust Company LLC. *See* Mot. at 4-5.

As an initial matter, these are transfers *among accounts owned by Ms. Boutros*. The transfers cited by the government did not involve the exchange of money in excess of $1,000 for some good or service. No money went to another person. They are not expenditures. Importantly, there is no allegation that there was a dissipation of assets. Indeed, the large transactions cited by the government are between Ms. Boutros's accounts in *the same bank*, Charles Schwab, which are essentially a bookkeeping entry.

Even if the Court agrees with the government that such self-transfers are nevertheless "transactions" within the meaning of the Court's order, there is no evidence that the transfers were anything more than a misunderstanding of the condition by Ms. Boutros. Such a misunderstanding is consistent with the fact that the government has cited no actual expenditures by Ms. Boutros. She knew she was not permitted *to spend* more than $1,000 in a single transaction. Indeed, when a question arose as to whether counsel for Ms. Boutros in her pending child custody matter could effectuate payment of its invoice by drawing down its retainer, undersigned counsel called Officer Lewis at Pre-Trial Services, *who confirmed that such draw down of retainers would not be an issue*.

In addition, as to the transfers within Charles Schwab, these transfers were made after Ms. Boutros suspected that the security on her account had been breached when she noted

8

several unauthorized "micro-deposits" in her brokerage account. *See* Ex. 4 at 31 (showing credits of $0.12 and $0.29 and a reversing debit of $0.41). Micro-deposits are small deposits (and often a withdrawal in the same amount to reverse the deposit) made to verify the existence of a bank account. Ms. Boutros is unfamiliar with the entity listed in the description for these micro-deposits: "BBT_TRANSFER TRIALDEBIT 1911031." *See id.* When Ms. Boutros noted this unauthorized activity, she moved most of the funds in the checking account to her brokerage account to avoid a potential fraudulent withdrawal and loss of funds. This fear of a fraudulent withdrawal following the micro-deposits explains the three self-transfers of $10,000, $50,000, and $49,000 made the same day between Ms. Boutros's accounts at the same bank. *See id.*

Respectfully submitted,

DATED:  December 4, 2019

*/s/ William E. Zapf*
Jonathan Jeffress (D.C. Bar No. 479074)
William E. Zapf (D.C. Bar No. 987213)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
jjeffress@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Tricia Steele Boutros*