UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 19-mj-00264-GMH |
| : | |
| TRICIA STEELE BOUTROS, : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S REPLY MOTION TO REVOKE RELEASE

The United States, through its attorney, the United States Attorney for the District of Columbia, respectfully files its reply to the Defendant's Opposition to the Government's Motion to Revoke Release. Def.'s Opp'n, ECF No. 14.

**I.     The Defendant violated her release conditions by not obtaining Pretrial Services Agency approval for the $29,000 wire transfer to her Charles Schwab account.**

As part of Magistrate Judge Robinson's release order, the Defendant was required to obtain approval from the Pretrial Services Agency (PSA) to conduct any financial transaction over $1,000. Order Setting Conditions of Release, ECF No. 9. The Defendant does not and cannot claim that PSA approved the $29,000 wire transfer to her account from J.S.

Faced with the fact that the transfer was an undisputed violation of her release conditions, the Defendant's only recourse is to now allege that the $29,000 wire transfer was not subject to the Court's order because "she transferred a total of $30,000 from her Charles Schwab brokerage account to her Paxos[1] account prior to the wire at issue on October 25, 2019, and prior to the Court's order imposing conditions of release." Def.'s Opp'n, at 7. While the Defendant "*maintains* that she *understood* that she received the [$29,000] wire transfer as part of a legitimate financial transaction" involving her Paxos account, she fails to provide any facts or documents

---

[1] Paxos offers crypto products and services.

connecting the $30,000 Paxos transfer to her receipt of $29,000 from J.S.'s Schwab account.  Id. (emphasis added).

On its face, the Defendant's attempt to package the October 30, 2019, $29,000 wire transfer from J.S.'s Schwab account to her Schwab account as part of a "legitimate" financial transaction involving $30,000 that she transferred on October 25, 2019, to her Paxos account is nonsensical. The Defendant does not offer any explanation as to the purpose of the $30,000 Paxos transfer or how it supposedly led to the $29,000 transfer from J.S.  J.S. does not have a Paxos account.  He has never spoken to or communicated with the Defendant.  He never "bought" anything from the Defendant.

"Legitimate" financial transactions can readily be described and backed up with documentation.  The Defendant's failure to do so is not surprising.  As discussed in the Government's Motion to Revoke, on November 7, 2019, the Defendant contacted Schwab via an on-line chat session about the reversal of the $29,000 transfer from J.S.'s account.  The Schwab representative asked her relevant questions such as "the purpose of the wire" and her "relationship to the sender."  ECF No. 10-2, at 4.  Although the Defendant told the representative that "I will provide you with any information I can to get this resolved immediately," id. at 3, she ignored the representative's straightforward questions and ended the chat session.

The Defendant has provided no information to support her contention that the October 30, 2019, $29,000 wire transfer to her Schwab account was not subject to the Court's release order because it was part of a "legitimate" transaction involving $30,000 that she transferred from her Schwab account to her Paxos account five days earlier.  There is clear and convincing evidence that the Defendant violated her release conditions by not obtaining PSA approval for the $29,000 transfer.  The Court should revoke the Defendant's release.

2

## II. There is probable cause to believe that the Defendant participated in a scheme to defraud J.S. in violation of federal and local law.

The Defendant's Opposition understandably focuses on discrepancies in J.S.'s statements to Schwab and the FBI about the circumstances leading to the $29,000 wire transfer from J.S. to the Defendant. However, the Defendant neglects to address the basic facts that are not in dispute. These facts establish probable cause to believe that the Defendant violated federal and local law.

As an initial matter, "[t]he government has provided no evidence or theory as to the identities of the two males who allegedly called J.S. or how Ms. Boutros is linked to either of them," Def.'s Opp'n at 3 n.2, because the Government is not and does not need to allege the identity of the callers or the Defendant's link to them to establish probable cause. The Government's "theory" is that the Defendant knowingly participated in a scheme to defraud J.S. by receiving fraudulently obtained funds and providing false and misleading information to Schwab in a failed effort to have the funds returned to her once Schwab reversed the wire transfer.

It is uncontroverted that $29,000 was transferred to the Defendant's account as a result of a phone call to J.S. ostensibly related to software on his computer. The Government has attached the Schwab fraud investigator's notes of his conversations with J.S. as Exhibit A.[2]

The notes from November 5, 2019, indicate that J.S. informed the investigator that the callers "were very persistent and aggressive" and "said he gave in despite his better judgment." The investigator further documents that he spoke to J.S. on November 7, 2019. J.S. explained that "two males had contacted him" and "the initial caller . . . was aggressive." When J.S. "refused to comply with the callers [sic] requests the individual stated he would transfer [J.S.] to his 'supervisor' and got an individual who stated his name is Jack Wilson on the line. This individual

---

[2] The Government has previously provided the notes to defense counsel.

3

did not have an accent but was also aggressive.  The supervisor convinced [J.S.] to send the funds and provided instructions."

J.S.'s conversation with the callers, who were aggressively trying to get J.S. to agree to install or update software on his computer, resulted in him authorizing a $29,000 wire to the Defendant's account, a $5,000 wire to a State Bank of Southern Utah account holder in Las Vegas, Nevada, and a $24,000 wire to a Bank of China account holder in Hong Kong.  Ex. B.  As the Defendant's Opposition rightfully recognizes, no person would knowingly "agree to pay $58,000 for virus protection."  Def.'s Opp'n at 6.  The circumstances of the transfers are not the hallmarks of a "legitimate" transaction.

The $29,000 wire to the Defendant's account was either a legitimate transaction or the product of fraud.  Schwab correctly concluded that J.S. had been defrauded and consequently returned the $29,000 to J.S.'s account and recalled the $5,000 wire.[3]  Ex. A. at 2.  The facts and circumstances of the transfer establish probable cause to believe that J.S. was defrauded and that the Defendant unlawfully obtained $29,000 from J.S.

The Defendant's communications with Schwab further support the conclusion that the $29,000 transfer to the Defendant's account was part of a scheme to defraud J.S. and that the Defendant participated in the scheme.  In a November 7, 2019, on-line chat session with a Schwab representative, the Defendant described the transaction as "a legitimate arms [sic] length agreement for which a federally insured wire was sent in exchange for fair market value of *the property*."  ECF 10-2, at 5 (emphasis added).  During the 48-minute chat, the Defendant referred to "property" or "the property" nine times without specifying what it was.

---

[3] Schwab never fulfilled the wire to the Bank of China account because the $24,000 wire transfer request to a Bank of China account raised concerns.

The Defendant claimed, "I have an urgent situation I need assistance with. A $29,000 wire I received last week in exchange for *property* sold to the buyer was just reversed back out of my account. That should never have happened as *the property* was transferred last week." Id. at 2 (emphasis added). As detailed below, the Schwab representative repeatedly requested that the Defendant provide further information.

> Can you please provide me with a few more details, such as the purpose of the wire, the name of the sender, and your relationship to the sender? Any other information you can provide would be a tremendous help. Id. at 3-4 (02:47:10 PM time stamp).

> Can you please provide me with a few more details, such as the purpose of the wire, the name of the sender, and your relationship to the sender? Any other information you can provide would be a tremendous help. Id. at 4 (02:53:12 PM time stamp).

> What other information can you provide me about the wire, the sender, and your relationship to them? Id. at 4 (02:56:23 PM time stamp).

> Who was the sender and what is your relationship to them? Can you please confirm their name for me. Id. at 4 (03:02:21 PM time stamp).

> We need more details from you. Id. at 4 (03:02:38 PM time stamp).

> Are you able to confirm for me the name of the person that sent the wire, please? That will help with our review. Id. at 5 (03:13:27 PM time stamp).

The Defendant never answered or even attempted to answer any of these questions or provide further information. She evaded the questions and ultimately stopped responding to the representative.

Anyone who engaged in a so-called "legitimate arm's-length agreement" in which they were paid $29,000, but then had those funds reversed from their account, would have no concern about providing details of the transaction to the bank in order to get their money back. In that circumstance, people (including lawyers) would not repeatedly refer to the subject of the transaction as "property" and provide *no* details about the purported "legitimate" transaction.

"Property" can be an unlimited number of items. Anyone who claimed that their bank had wrongfully taken $29,000 from their account would not refuse to inform the bank what property was provided to the "buyer" in exchange for the $29,000. The aggrieved account holder would not be hesitant to reveal that the property was - for example - a car, or house, or jewelry, or software, or, as the Defendant now appears to be stating, crypto currency. The Defendant's use of the generic "property" is not, as the defendant contends, "consistent with a legitimate financial or investment transaction where the investment is property." Def.'s Opp'n at 7. It indicates that the Defendant did not want to divulge the type of property because she knew it was not a legitimate transaction and that she in fact had not provided any "property" to J.S.

The Defendant, in her communications with Schwab, touted her legal background as "a 14 year licensed corporate finance attorney in the District of Columbia," ECF No. 10-2, at 5,[4] asserted that she had "written communications with the buyer," ECF No. 10-5, at 3, and threatened to file an arbitration claim. Id. at 3-4. Yet, she has never provided any "written communications with the buyer" to Schwab or this Court. Nor did she file an arbitration claim, which would have obviously forced her to provide detailed information about the "property" that was "exchanged" in the "legitimate" transaction. The Defendant's failure to substantiate the transaction to Schwab and this Court is further evidence that J.S. was scammed and that the Defendant participated in the scheme.

The Defendant also used Paxful,[5] a "peer-to-peer bitcoin marketplace," to discuss J.S. with an individual who uses the username "RedWomen." A transcript of their chat sessions is attached

---

[4] The Defendant also stated that she was "a 17 year DC Licensed Attorney who specializes in Capital Markets, Corporate Securities and Financial Regulatory matters." ECF No. 10-5, at 3.

[5] Paxful is not the same company as Paxos.

as Exhibit C.

On November 7, 2019, the Defendant wrote, "NEED NUMBER for J.S." Ex. B at 29. On November 15, 2019, the Defendant asked RedWomen for J.S.'s "email address or his messaging app ID/number." Id. She specified that she wants "what ever [sic] he [meaning J.S.] used to communicate with you on he [sic] night of Oct 30 [sic] the night he sent the wire." Id. The Defendant then offered to "make a $30,000 USD donation" to a charity that RedWomen purportedly runs "if you [meaning RedWomen] help me from getting falsely accused of a crime caused by your buyer, and help me get him to return the money and get your zelle buyers to retract their disputes by tomorrow when I meet with morgan stanely [sic]." Id.

The Defendant's conversation with RedWomen is extremely disturbing. The Defendant, who advised Schwab on November 12, 2019, that she had "written communications with the buyer," is now, three days later, offering to pay $30,000 to RedWomen's purported charity to obtain *RedWomen's* contact information for J.S. If the Defendant had communicated with J.S., she would not need to obtain any contact information for him from RedWomen. The Defendant never mentioned RedWomen to Schwab or this Court even though, according to the Defendant, RedWomen communicated with J.S. on the night of the transfer. Finally, and most troubling, is the Defendant's offer of $30,000 if RedWomen provides the contact information. The offer could arguably be viewed as an act of obstruction. However, the salient relevancy for this proceeding is the additional evidence it provides that the $29,000 transfer from J.S. to the Defendant was anything but "a legitimate arm's-length agreement." A $30,000 payment from the Defendant to obtain contact information for J.S., her purported "buyer," is not "consistent with a legitimate financial or investment transaction."

The fact that a call about software led to the $29,000 transfer from J.S. to the Defendant;

the Defendant's failure to provide any details about the wire to Schwab; including the purpose of the wire; the Defendant's offer of $30,000 to RedWomen to obtain J.S.'s contact information; and the Defendant's unsupported representation to this Court that the $29,000 transfer was related to a $30,000 transfer to her Paxos account five days earlier, are sufficient evidence for the Court to find probable cause to believe that the Defendant violated federal and local law as detailed in the Government's Motion to Revoke.   The Court should enter an order of revocation.

        Respectfully submitted,

        JESSIE K. LIU
        United States Attorney

By:         /s/
        Anthony Saler, D.C. Bar No. 448254
        Assistant United States Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 252-6971
        Anthony.Saler@usdoj.gov