UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Criminal No. 20-cr-00082 (APM) |
| TRICIA STEELE BOUTROS, : | |
| : | |
| Defendant. : | |

## DECLARATION IN SUPPORT OF SENTENCING

I, Cassidy T. Smith, make the following unsworn declaration pursuant to 28 U.S.C. §1746:

### INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I have been so employed since September 2018. I am one of the case agents for the FBI's investigation of TRICIA STEELE BOUTROS (defendant, or "BOUTROS"). This declaration attempts to: (1) outline the scope of the defendant's fraud for consideration by the Court when determining her sentence; and (2) offer additional information in support of the Government's proposed restitution and forfeiture amounts. It is not exhaustive and does not include all the fraudulent conduct known to the United States. This declaration references attachments, which are incorporated herein by reference.[1]

2. My ability to provide an informed and accurate assessment of this matter is based on my education, background, and experience. I am assigned to a white-collar crime squad at the FBI's Washington Field Office. Prior to my employment with the FBI, I was employed as a Special Agent of the United States Secret Service ("USSS"), where I was assigned to the Financial Crimes

---

[1] For ease of review, certain attachments have had relevant portions highlighted or annotated, and spreadsheets in their native forms have been converted to PDFs.

Task Force. During my employment with the FBI and USSS, I have investigated fraud committed against financial institutions, private businesses, and individuals. I have investigated financial crimes such as wire fraud, bank fraud, and money laundering. I have training and experience in the enforcement of the laws of the United States.

3. In preparing this declaration, I have also relied on the financial analyses undertaken by FBI Forensic Accountant Gary Frazier, who was also extensively involved in the investigation. He is a Certified Public Accountant, a Certified Fraud Examiner, and has worked as a Forensic Accountant for the FBI since 2010.

**BACKGROUND**

4. At the time of the offense, BOUTROS was an attorney with bar licenses in Washington, D.C., and Texas. In October 2016, BOUTROS created a law firm she called Steele Legal PLLC ("Steele Legal"). BOUTROS was the founder, executive operator, and the sole employee of Steele Legal. The FBI analyzed BOUTROS's numerous bank accounts and was unable to identify any legitimate business income from clients of Steele Legal. In other words, Steele Legal was solely a front for BOUTROS's fraud.

5. In or around April 2017, BOUTROS established an ostensible charity she called the Women's Truth and Justice Foundation ("WTJF"). The WTFJ incorporation records state that it was organized exclusively for charitable purposes to qualify it as an Internal Revenue Code section 501(c)(3) exempt organization. Internal Revenue Service ("IRS") records show that the WTFJ did not have 501(c)(3) status. *See* Attachment A1 (WTFJ Incorporation Documents and IRS Information).

6. BOUTROS interacted extensively with a criminal hacker named Danial Jeloudar ("Jeloudar") during her scheme to defraud banks and account holders. Jeloudar is currently a

fugitive from justice and is included on the FBI's Cyber Most Wanted List for conspiring to obtain, distribute, and use unauthorized credit card numbers and other personal identifiers to obtain goods and services in the United States by fraud. In August 2017, Jeloudar was indicted by a federal grand jury in the United States District Court for the District of South Carolina. Evidence indicates BOUTROS's relationship with Jeloudar started in at least November 2016 and continued even after she became aware Jeloudar was a fugitive. *See* Attachment A2 (discussing Jeloudar's status with another computer hacker).

7. The Government has reviewed digital and physical evidence seized from BOUTROS's residence pursuant to a search warrant that was executed in May 2019, including the chats and email correspondence referenced herein. BOUTROS had in her possession at the time of the seizure personal identifying information, and/or bank account log-in information for hundreds of people. *See, e.g.,* Attachment A3 ("Newest Bank Chart" containing over 500 distinct bank usernames and passwords and the corresponding bank accounts as well as personal identifying information).

## NATURE AND SCOPE OF THE DEFENDANT'S CRIMINAL CONDUCT

8. From at least 2016 until her arrest in October 2019, BOUTROS participated in various schemes to defraud individual victims and businesses located within the United States. Through these various fraud schemes, third-party bank accounts were illegally accessed, and fraudulent checks and unauthorized automated clearing house ("ACH") transfers were debited from these accounts.[2] The stolen monies were then credited to accounts belonging to BOUTROS,

---

[2] An automated clearing house, or automated clearinghouse, also known as ACH, is an electronic network for financial transactions that generally are domestic low value payments being made by credit transfers or direct debits.

3

one of her businesses, or to other individuals or third-party vendors for her benefit. Information obtained from the victims' compromised bank accounts was also used to create new, fraudulent bank accounts, which were then used to launder the proceeds of the various fraud schemes.

9. In total, the government identified approximately 202 individuals and 51 financial institutions affected by BOUTROS's conduct.

### Unauthorized ACH Transfers

10. BOUTROS admitted in her Statement of Offense to causing fraudulent ACH transfers to be issued from accounts that she illegally accessed to accounts that she controlled (ECF No. 39, ¶ 8). BOUTROS initiated unauthorized ACH withdrawals to steal money directly from victim accounts. For example, in July 2017, victim H.S.'s checking account at JP Morgan Chase Bank (JPMC) experienced several unauthorized ACH withdrawals that were credited to BOUTROS personally or to Steele Legal. *See* Attachment A4 (H.S.'s Bank Statement). Several copies of fake ACH authorization forms associated with H.S.'s bank account were seized from BOUTROS's email account and from one of her myriad electronic devices during the execution of search warrants. *See* Attachment A5 (ACH authorization form for H.S.'s bank account). H.S. was not familiar with BOUTROS or Steele Legal and did not authorize any payments to BOUTROS from his accounts. JPMC suffered a loss of $19,433 as a result of this conduct.

11. Unauthorized ACH and other transfers also resulted in a loss of $52,296.95 to JPMC resulting from monies withdrawn from the account of a H.S.G., an unrelated corporate victim. *See* Attachment A6 (H.S.G. account statement).

12. Victim "P.C." opened a bank account with JPMC in 2018. She deposited a certified check from Bank of America in the amount of $42,000 when she opened up the JPMC account. The JPMC savings account was set up as a joint account for her and her mother and was intended

4

to be used for retirement. In August 2018, $42,000 was fraudulently withdrawn in transactions payable to Steele Legal. The victim only recently learned that her account had been depleted to a near zero balance, and therefore, JPMC has thus far declined to refund this victim's money. *See* Attachment A10 ("PC Account Statements").

13.   JPMC suffered additional losses as noted below for transactions going through the following victim accounts:

| Account Holder | Loss Amount |
| --- | --- |
| A.E. and H.E. | $118,000.00 |
| Y.X. | $65,565.56 |
| I.H.T.W.[3] | $30,748.29 |
| E.S. | $12,150.00 |
| M.A. | $5,837.12 |
| S.S. | $4,101.14 |
| S.D. | $22,580 |

*See* Attachment A7 (Spreadsheet Accounting for JPMC Losses, E.S. Statements and Support, M.A. Statements and Support, S.S. Bank Statements, Y.X. Bank Statement, S.D. Bank Statement, and H.E. and A.E. Bank Statements).

---

[3] I.H.T.W. is the wealth management company identified in Paragraph 18(b) in the Statement of Offense (ECF No. 39) ("Defendant Boutros illegally accessed…in the name of a wealth management company."

5

14. As admitted in the Statement of Offense, BOUTROS used accounts at BB&T to further advance her fraud using ACH transfers (ECF No. 39, ¶¶ 9-12). As a result of these transfers, BB&T suffered a loss of $378,545. *See* Attachment A8 (Summary of BB&T Loss Support).

15. As admitted in the Statement of Offense, Plooto, Bluepay, ACH Works, Bill.com, BB&T, and ACH Works were used to process ACH transfers from accounts that BOUTROS illegal opened or accessed. As a result of BOUTROS's actions, Plooto suffered a loss of $186,270, Bill.com suffered a loss of $225,228.90, BB&T suffered a loss of $378,545.00, ACH Works suffered a loss of $45,405.00, and Bluepay suffered a loss of $598,965. *See* Attachment A9 (Bluepay loss support and summary of Plooto loss support).

**Fraudulent Checks**

16. The defendant caused fraudulent checks to be written from compromised bank accounts for her benefit. BOUTROS discussed making phony checks during her conversations with computer hackers, and the FBI found check templates in her apartment. *See* Attachment A11 (phony checks and check template).

17. BOUTROS created, or caused to be created, fraudulent checks from bank accounts without the account holders' knowledge. In these instances, BOUTROS caused the check to appear to have been drawn from an account she maintained since the maker of the check was ostensibly reflected as BOUTROS or Steele Legal, instead of the true owner of the account. These checks were then made payable to entities that BOUTROS benefited from or to her creditors. For example, in October 2018, BOUTROS caused two checks to be paid to her attorneys from a JPMC account belonging to the victims. In reality, BOUTROS obtained the necessary account information and created the check herself. BOUTROS was identified as the purported account

holder on the bogus checks, which listed her home address. *See,* for example, Attachment A12 (Unauthorized check from a JPMC account).

### Fraudulent Accounts at Financial Institutions

18. BOUTROS used victims' identities to open fraudulent bank accounts without their knowledge or consent. BOUTROS used these fraudulent bank accounts to launder her fraud proceeds and to conceal her association with the fraud. In her communications with hackers, BOUTROS referenced these accounts as "drop" accounts. For example, in September 2017, BOUTROS wrote a computer hacker that she had "over 100k in drops ready to transfer…it takes a long time to make sure they are clean enough not to charge back." *See* Attachment A13 (Chats regarding "drop" accounts).

19. In other instances, funds were transferred directly from the victims' legitimate bank accounts into BOUTROS's fraudulently created joint "drop" accounts. For example, BOUTROS opened a fraudulent joint bank account at Goldman Sachs using victim A.S.'s personal information. A.S. was not familiar with BOUTROS and did not authorize anyone to open a bank account in his name. BOUTROS later transferred, or caused to be transferred, funds from A.S.'s legitimate bank account at JPMC into this fraudulent drop account at Goldman Sachs. *See* Attachment A14 (Goldman Sachs statement for fraudulent joint account for A.S. and BOUTROS). JPMC suffered a loss of $7,024 for this conduct.

20. A.S. and his wife's names, social security numbers, dates of birth, address, and email addresses, as well as their bank account numbers, bank usernames, and passwords were discovered on one of the schedules found on one of BOUTROS's electronic devices.

21. Some of BOUTROS's transfers from these drop accounts occurred via checks made payable to BOUTROS or Steele Legal. For example, as BOUTROS admitted in the Statement of

7

Offense (ECF No. 39, ¶¶ 20-21), two checks were written from a fraudulently created KeyBank account in victim R.D.'s name that were made payable to Steele Legal. These checks were deposited into Steele Legal's account at PNC Bank. Additionally, R.D.'s name, social security number, date of birth, address, driver's license number, bank account numbers, bank login, and password were discovered on a file named "Frozen Accounts" that was located on one of BOUTROS's electronic devices. R.D. was not familiar with BOUTROS, and he did not authorize anyone to open an account in his name.

22. Victim N.D. also had an account opened in her name at the defendant's address, and a debit card generated, which was discovered at BOUTROS' home. The account was used to conduct transactions without N.D.'s consent, resulting in a loss of $5,727. *See* Attachment A15 (N.D. fraudulent account statements)

23. BOUTROS opened several unauthorized accounts in her ex-husband's name. Once she asked Jeloudar to call TD Bank and represent himself as her ex-husband. *See* Attachment A16 (Communications between Jeloudar and BOUTROS stating, "…i was wondering if you could pretend to be (ex-husband's name) using your 202 number and give them the debit card info and (ex-husband's) info and see if they will provide either the acct # or reset the password)." BOUTROS also discussed with a computer hacker her use of a line of credit with her ex-husband's social security number, writing in February 2017: "I still have a credit line of $560000 which i can use no matter what and it's under (ex-husband's name) SSN!! hahahah… and after we are divorced, it's his debt lol." *See* Attachment A17 (Chat messages).

### Use of Steele Legal to Facilitate Fraud

24. BOUTROS abused her status as an attorney to facilitate her fraud schemes. For example, her bar license gave her the ability to run a background check on a victim to obtain

personal identifying information, which she then used to generate phony identification documents. BOUTROS discussed this aspect of her scheme with a computer hacker, noting:

> "i have that passport template...i have an SSN database…and i can use my background check program to find out all there details… and i need to file some subpoenas with the court starting very soon, before 12pm but it can be done as long as they are over 33 (years of age) b/c my bar license gives me access to a background check so i can see all their addresses and everything about them."

*See* Attachment A18 (Chats regarding bar attorney license, passport template and false ID).

25. BOUTROS did not merely possess these fabricated identification documents; she used them to open accounts in victims' names. *See,* for example, Attachment A19 (fraudulent account applications for victim S.L.). S.L. was not familiar with the defendant and did not authorize anyone to open a bank account in her name.

26. Using Steele Legal, the defendant was able to move large amounts of fraudulently obtained funds with less suspicion than if the accounts were in her own name. *See* Attachment A20 (BOUTROS explaining to a hacker her access to premium accounts due to her active bar number).

27. BOUTROS strengthened the illusion of the legitimacy of Steele Legal by writing "legal fees" or "legal services" on the memo section of checks fraudulently withdrawn from victims' accounts, including victim R.J. *See,* for example, Attachment A21 (Bank statement and fraudulent check from R.J's account at JPMC). Transactions associated with R.J.'s accounts resulted in a loss of $2,674.00 to JPMC.

### The Defendant's Assistance from Known Computer Hackers

28. BOUTROS worked with individuals known and unknown to the government to accomplish her various fraud schemes. As noted above, BOUTROS worked with Jeloudar, and several other hackers, and she often communicated with them via email and messaging

9

applications, such as Google Chat. She went so far as to describe their coordination as a "team effort" *See* Attachment A22 (Chats with a computer hacker, describing a team effort to steal personal identifying information).

29. In May 2019, BOUTROS admitted to knowingly entering into an agreement with Jeloudar whereby he paid off her credit card and student loan debt, and BOUTROS compensated him through cryptocurrency payments, which he was otherwise precluded from engaging in due to his Iranian citizenship (indeed, BOUTROS knew he was purportedly a hacker working for the Iranian government).

30. When establishing a bank account online, some financial institutions require the applicant to provide a picture of themselves holding their identification card or passport. BOUTROS occasionally opened her fraudulent accounts using pictures of hackers holding fraudulent identification cards in a male victims' names. For example, a picture of Jeloudar holding an identification card for the defendant's ex-husband was identified on one of BOUTROS's electronic devices. *See* Attachment A23 (Photograph of Jeloudar holding a driver's license dated June 22, 2017).

31. BOUTROS even requested assistance from Jeloudar to help facilitate a fraud scheme to pay her child support ($30,000) with monies drawn from a check from a victim's bank account. When BOUTROS's ex-husband questioned the legitimacy of the check, BOUTROS falsely claimed that the victim and Jeloudar were her employees at Steele Legal. In an email sent in April 2017, BOUTROS stated to her ex-husband: "(Victim's name) works with Danial [JELOUDAR], assisting stateside, and he must have used his signatory to send. Danial is my head finance manager and runs the firm's billing, accounts receivables, payroll, etc. but a few work

under him. Yes, it's fine to deposit." *See* Attachment A24 (Emails between the defendant and Jeloudar).

32.     BOUTROS also sought assistance from computer hackers to break into a MedStar medical server to obtain documents to use in a civil lawsuit involving her ex-husband. In connection with the lawsuit, BOUTROS falsely claimed she had been diagnosed with cancer.

33.     In June 2016, BOUTROS sent the following message to someone associated with the website neighborhoodhacker.com:

> "I am in desperate need of a Full Package of Detailed Medical Records for a White female 35-45, having Papillary Thyroid Cancer (diagnostics, tests, surgery, post-surgery and complications, if any...) I have lables [sic] to stick on the records or your can just change my name electronically…Last, I don't know if this is possible, but if my records could be "found" by the records teams at each place somehow, that would be ideal. Like if there was a way to get them to be inserted under my patient name there?" [4]

After she obtained the fabricated documents with the assistance of a different hacker, BOUTROS attempted to identify one or two "actors" to play a physician and radiologist in depositions. *See* Attachment A25 (Email requesting the creation of false medical documents and the placement of those records into the MedStar system and Email to lawactors.com).

34.     Communications found in BOUTROS's email accounts indicate that she later discussed with a hacker how she took over a Medstar doctor's profile by illegally accessing the medical system's servers. In June 2016, she wrote:

> "90% of the files I need are stored on a cloud based system…. Which means not only can I easily recreate them (I've already done it myself with another cloud based EMR that is more sophisticated than this one.. but it's simple to hack the actual once for reinsertion. Now I have access to the format for the files, can file the disability claim and get paid back for months of lost wages at the very least. (I can send them to the directly to the Insurance Co. through the Medstar Doximity account I hacked for one of my older doctors- remember how I told you I took over her profile and can e-mail and fax things to and from "her"?)."

---

[4] The hacker involved in this request declined to participate in the scheme telling BOUTROS that it was illegal.

11

*See* Attachment A26 (June 2016 email re Medstar Hack).

35. During the FBI's search of BOUTROS's residence, a large stack of blank prescription paper was located and seized. Additionally, printed prescriptions were seized from her residence, and prescription templates were also found on one of her electronic devices.[5]

### Identity Theft

36. Beginning in or around 2017, BOUTROS began to seek out individuals with similar names as her own, for the purpose of stealing their identity, opening bank accounts, and defrauding financial institutions. For example:

    a. Victim P.E.S.'s date of birth and social security number were used in conjunction with BOUTROS's and Steele Legal's actual physical and email addresses to open accounts at Merrill Lynch, Bank of America, First ACH, M&T Bank, Western Union, Intuit QuickBooks, and Fidelity. BOUTROS's actions caused Fidelity to freeze the victim's legitimate account;

    b. Victim P.A.S.'s personal information was used to open fraudulent accounts at TD Ameritrade, USAA, and E*Trade. Her personal identifying information, usernames, and passwords for several different banks was included on a schedule found on one of BOUTROS's computers; and

    c. M.S. and Company 1, were also victims of BOUTROS's fraud. BOUTROS attempted to use the domain name "steelcapital.com" (whereas the real Company 1 used the domain of "steelecapital.org.") to set up an account at

---

[5] As the court is likely aware, an illegal prescription drug shipment addressed to BOUTROS at her residence in Washington, D.C., was seized in November 2019 via warrant issued by US Magistrate Judge G. Michael Harvey by a US Postal Inspector (Case No. 19-SW-419).

Coin Cafe, a cryptocurrency exchange, as well as several other financial institutions. An unauthorized IRS Employee Identification Number application for Company 1 was identified on one of BOUTROS' electronic devices. M.S. and Company 1 reported to the FBI that it had received numerous phone calls from individuals accusing the company of withdrawing funds from their accounts without their permission.

37. Victims with similar names to BOUTROS were not the only individuals or businesses whose identity she stole. For example, as admitted in the Statement of Offense, D.R. and his wife Y.R. were also victims of BOUTROS's identity theft and fraud schemes (ECF No.39, ¶18). In an August 2017, chat, the defendant wrote: "i [sic] totally hacked [D.R.'s] Merrill accou [sic]…i've [sic] already taken over his mymerill." *See* Attachment A27 (BOUTROS' messages to a hacker about D.R.). BOUTROS made her intentions to victimize D.R. clear when she communicated to a computer hacker that "[D.R.] is the new target." *See* Attachment A28 (Communications between a hacker and the defendant).

38. BOUTROS opened several fraudulent "drop" accounts in both D.R.'s and Y.R's names, and checks were written from these fraudulent D.R. and Y.R. accounts payable directly to Steele Legal. Further, in or about July 2017, Steele Legal leased virtual office space on K Street in Washington, D.C.; BOUTROS also listed D.R. and Y.R. on the lease. *See* Attachment A29 (Lease information for 1629 K Street).

## WOMEN'S TRUTH AND JUSTICE FOUNDATION

39. As previously mentioned, BOUTROS created the WTJF. She falsely portrayed WTJF as a Delaware corporation that provides reduced-fee and pro bono legal services to under-represented women and minorities involved in high conflict custody litigation.

13

40. BOUTROS used WTJF to launder fraudulently obtained funds. The investigation identified several fraudulent checks from different victims that were made payable to the WTJF. *See* Attachment A30 (Fraudulent checks made payable to the WTJF). These checks were deposited into an account at TD Bank for the WTJF that BOUTROS maintained as a signatory. The victims whose funds were credited to the WTJF's bank account were not familiar with BOUTROS or the supposed charity and did not authorize these checks.

**ADDITIONAL INFORMATION IN SUPPORT OF FORFEITURE AND RESTITUTION**

41. BOUTROS's own statements illustrate the significant loss attributable to her bank fraud. During her fraud scheme, BOUTROS told a computer hacker that she had "almost $5 million" in funds under her control while discussing hacking into various brokerage accounts. *See* Attachment A31 (Chats with computer hacker).

### JPMC Account Intrusions

42. As admitted in the Statement of Offense, BOUTROS used accounts at JPMC in furtherance of her fraud schemes. The government developed a schedule of financial accounts at JPMC that were either directly connected with BOUTROS's fraud scheme (*i.e.*, accounts from which funds were payable directly to BOUTROS or Steele Legal) or were associated with BOUTROS in another tangible way (*i.e.*, accounts BOUTROS linked to other known accounts she controlled or from which she benefitted).

43. Following the entry of the guilty plea in this matter, the Government provided JPMC with the schedule of accounts that were either directly connected to BOUTROS or that were associated with her in some material way during the course of the investigation. JPMC queried two of its systems ("CCS" and "LAW") and provided the government with a schedule depicting its losses on those accounts. These losses totaled $2,943,164.09.

44. To avoid double counting of losses, in calculating the government's proposed forfeiture and restitution amounts, the government backed out of this number the losses attributable to the specific victim accounts at JPMC, as discussed herein.

45. The government then reviewed certain schedules identified on BOUTROS's seized digital devices, which depicted victim's names, bank account information, and other personal identifying information that BOUTROS illegally obtained during her fraud schemes. The government cross-referenced information on the JPMC loss schedule with BOUTROS's own schedules, and it determined that the JPMC Account Intrusion Scheme resulted in a loss of $683,159.66 not otherwise identified (including $46,445.24 that went through fraudulent accounts associated with D.R. and Y.R).

## CONCLUSION

46. After BOUTROS was confronted by the FBI in May 2019 regarding her conduct, she continued to commit fraud not only until her October 2019 arrest, but also after she was released on bond, which ultimately resulted in her detention and incarceration in December 2019.

47. Evidence indicates that after this Court released BOUTROS following the entry of her plea, she accessed her Facebook account and her Coin Cafe account in violation of the conditions of her release. *See* Attachment A32 (Facebook Log-in Data and Coin Cafe Screenshots and Communications).

48. While investigating a possible violation of the conditions of release, the FBI discovered that BOUTROS, doing business as Steele Legal, previously had made approximately 21 orders through Coin Cafe via ACH transfers to purchase Bitcoin, a cryptocurrency. After BOUTROS placed the orders, seven of them were charged back, resulting in a loss of $31,675 to Coin Cafe. BOUTROS's Coin Cafe account was accessed using IP addresses that resolved to

BOUTROS's former address in Washington, D.C. *See* Attachment A33 (Support for Coin Cafe Loss Amount) (Verizon records showing IP addresses, spreadsheets from Coin Café detailing ACH transactions and bitcoin purchases).

49. Based on the foregoing, I submit the defendant was engaged in a significant pattern and practice of deception and fraud, with actual losses totaling at least $2,195,022.77.

50. I declare that the foregoing is true and correct to the best of my knowledge.

Executed on this 16 day of September 2020.

*/s/Cassidy T. Smith*
Cassidy T. Smith
Special Agent
Federal Bureau of Investigation