**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM NO. 20–cr–00082-APM |
| | ) | |
| TRICIA STEELE BOUTROS, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**DEFENDANT TRICIA STEELE BOUTROS'S
MEMORANDUM IN AID OF SENTENCING**

William E. Zapf (D.C. Bar No. 987213)
Jonathan Jeffress (D.C. Bar No. 479074)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
wzapf@kaiserdillon.com
jjeffress@kaiserdillon.com

*Attorneys for Tricia Steele Boutros*

## TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ............................................................................3

   A.  Ms. Boutros's Childhood.............................................................................4

   B.  College, Meeting and Marrying Her Ex-Husband, and Law School ..................7

   C.  Tricia's Career, Children, and Struggles with Addiction ...............................9

         1.   Tricia Begins Her Law Career at Vinson & Elkins ..............................9

         2.   Tricia's Pro Bono Work for the International Justice Mission...........10

         3.   The Start of a Family and a Struggle with Addiction........................11

   D.  Separation, Divorce, and Tricia Loses Custody of Her Children.....................15

   E.  The Offense Conduct...................................................................................17

   F.  Arrest and Pretrial Detention.......................................................................18

   G.  Her Support Network and Outlook...............................................................21

   H.  Psychological Evaluation ...........................................................................21

II.   A SENTENCE OF TIME SERVED, PLUS SUPERVISED RELEASE WITH TWELVE
      MONTHS OF HOME CONFINEMENT WOULD BEST SATISFY THE STATUTORY
      SENTENCING FACTORS...............................................................................26

   A.  Nature and Circumstances of the Offense and Character of the Defendant.....28

         1.   The Nature and Circumstances of the Offense....................................28

         2.   The Character of the Ms. Boutros .....................................................30

   B.  The Purposes of Sentencing ........................................................................31

         1.   Need for Just Punishment in Light of the Seriousness of the Offense.................32

         2.   Need for Deterrence ........................................................................34

         3.   Need for Incapacitation....................................................................36

         4.   Rehabilitation.................................................................................37

   C.  Need to Avoid Unwanted Disparities and Unwarranted Similarities................37

   D.  Kinds of Sentences Available......................................................................39

E.   The Sentencing Guidelines ............................................................................... 43

    1.   *The Guidelines Range in This Case Is Inappropriate Because It Is Not Based on Empirical Evidence or National Experience and Fails to Promote the Purposes of Sentencing.* ....................................................................................... 43

    2.   *The Court Should Grant a Downward Departure Pursuant to Section 5H1.3 and 5K2.13 of the Sentencing Guidelines.* ................................................................ 47

        a)   *The Court Should Adopt a Downward Departure Under Section 5H1.3 Because Ms. Boutros's Mental and Emotional Conditions are Present to an Unusual Degree and Distinguish Her Case from Typical Cases.* .................................................................................. 48

        b)   *The Court Should Adopt a Downward Departure Under Section 5K2.13 Because Ms. Boutros's Significantly Reduced Mental Capacity Contributed Substantially to the Commission of the Offense.* ........................................................................................ 50

F.   The Need to Provide Restitution ..................................................................... 54

III.  FORFEITURE ........................................................................................................ 55

IV.  FINANCIAL ABILITY TO PAY A FINE .......................................................... 56

V.   CONCLUSION ...................................................................................................... 56

In accordance with Federal Rule of Criminal Procedure 32(i)(1)(C) and Section 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Tricia Steele Boutros ("Ms. Boutros" or "Tricia"), by and through her attorneys, submits this memorandum to aid the Court in determining an appropriate sentence.

Ms. Boutros has pleaded guilty to one count of bank fraud under 18 U.S.C. § 1344(1), (2). *See* ECF No. 38. Ms. Boutros respectfully submits that, in lieu of a sentence of additional imprisonment, a sentence of time served (142 days), plus a substantial term of supervised release, with some portion of the beginning of that term to be served under home confinement, would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a).

In her plea agreement, Ms. Boutros and the government agreed that the pre-departure Estimated Guidelines Range is 78 months to 97 months, based on an Estimated Offense Level of 28 and a Criminal History Category of I. ECF No. 38 at 3-4. Under the plea agreement, however, Ms. Boutros has the right to seek a sentence below the Estimated Guidelines Range based upon (1) downward departures under U.S.S.G. §§ 5H1.3 (Mental and Emotional Conditions) and/or 5K2.13 (Diminished Capacity); and/or (2) a variance based on the factors listed in Section 3553(a). *Id.* at 4. For restitution under 18 U.S.C. § 3663A, the parties agreed that the victims suffered total pecuniary harm of at least $1.3 million and no more than $2.2 million. *Id.* at 7. For forfeiture under 18 U.S.C. § 982(a)(2)(A), the parties agreed that Ms. Boutros's forfeitable proceeds as a result of the offense were within the same range.[1] *Id.* at 8.

---

[1] The parties have attempted to reach agreement regarding the appropriate amounts for restitution and forfeiture within this range but have been unable to do so for reasons stated herein. *See infra* at Sections II.F. and III.

The U.S. Probation Office has agreed that the Estimated Guidelines Range in the plea agreement is correct, *see* ECF No. 45 at 14 ¶ 61, and has recommended a twelve-month downward departure under Section 5H1.3 from the bottom of the Guidelines range for a recommended sentence of sixty-six (66) months imprisonment, with a five-year term of supervised release, *see* ECF No. 46 at 1.

Neither the Estimated Guidelines Range nor the Probation Office's recommendation provides an appropriate sentence in this case. Although Ms. Boutros agrees with the Probation Office that a downward departure in this case is warranted, the length of the recommended departure and lack of a further variance is insufficient to account for the mitigating circumstances of this case.

As documented by the Probation Office in the Presentencing Investigation Report ("PSR"), Ms. Boutros has a long history of serious mental and emotional conditions, in addition to struggling mightily with ██████████ addiction. The attached psychological evaluation by Dr. Sara Boyd (Ex. 1), discussed further herein, reveals that Ms. Boutros has ██████████ ██████████████████ and that her psychological state significantly worsened in her adult years during an abusive marriage, becoming severe at about the time her criminal conduct began, and not long after her ex-husband filed for divorce, she faced enormous financial obligations, and she lost custody of her children, a psychologically devastating set of events for Ms. Boutros.

Aside from her mental and emotional state, Ms. Boutros's relative culpability is low as compared to the mine-run of cases. Although Ms. Boutros recognizes the serious nature and scope of her criminal activity—for which she takes full responsibility—the circumstances surrounding her conduct mitigate the need for a lengthy prison sentence. After enduring years of

abuse and ███████████ addiction for which she repeatedly sought treatment, and just days after ████████████████████, Ms. Boutros's husband demanded a divorce, the family home, full financial support, and sole custody of her two young children while Ms. Boutros was at the lowest point in her life. While once she had a high-paying position at a major law firm, she found herself without work and unable to pay mounting child support and attorney's fees, at one point ending up being jailed by the Alexandria Court for non-payment of arrears. Faced with desperate circumstances, and with her judgment severely impaired by ███████████, she engaged in a risky fraud spree, believing perhaps naively that, if she could just satisfy the financial pressures and afford to pay her lawyers, her ex-husband might relent and let her have access to her children.

Under these circumstances, a sentence of time-served with an extensive period of home confinement would serve the purposes of sentencing by satisfying the need for just punishment in view of the circumstances of the case, including Ms. Boutros's mental and emotional state, while providing Ms. Boutros with the best opportunity to address her mental and emotional issues through therapy and psychiatric treatment in a community setting, as well as avoid the heightened and significant dangers of COVID-19 within the Bureau of Prisons.

## I.     FACTUAL BACKGROUND

Ms. Boutros comes before this Court to be sentenced at the age of forty-one. She is a mother of two children: ████████████████████, whom she has not been permitted to see or communicate with by her ex-husband for about four years. Ms. Boutros has battled and survived physical and sexual abuse, crippling addiction ████████████████████, severe mental illness that is only now being recognized and treated properly, the collapse of her marriage after years of abuse and coercive control, the loss of a promising legal career, and the complete loss of her children. As recounted below, those circumstances do not excuse Ms.

3

Boutros's conduct but hopefully allow the Court insight as to how this once successful lawyer, a loving mother, and cherished sister and daughter engaged in the criminal activity to which she has now pleaded guilty.

### A.    Ms. Boutros's Childhood

By many outward measures, Tricia or "Trish," as she is known to those close to her, lived an idyllic childhood. Her brother Sam reports that she has "great parents who gave [her and her siblings] a very loving home, and taught [them] the framework of how to be respectful, thoughtful, caring and kind." Ex. 2 at 1. Tricia's father is a retired university math professor at the University of North Carolina Asheville. Her mother is a retired administrative assistant. Her older brother, Sam Steele, is a radio personality who lives in Asheville, North Carolina. She has one younger sister, Cindy Steele Agee, a homemaker who lives in Texas. Tricia's cousin Bethany Mandell notes in her letter that Tricia "was raised in a close, strong, and stable family" who attended church at least once, sometimes several times every week. Ex. 3 at 2. Tricia's parents instilled qualities in their children like love, respect, forgiveness, humility, kindness, perseverance, honesty, thankfulness, compassion, trust, and faith, to name a few that her Aunt Louise Kauffman mentions in her letter of support. Ex. 4.

Tricia was born and spent her early childhood in Clearwater, Florida. At the time she was born, her father was a Ph.D. student. Although money was tight during this time, she reported to the Probation Office that she felt that her material and emotional needs were met. PSR at 15 ¶ 73. When she was 10, the family moved to Asheville, North Carolina, after her father took a teaching position at the University of North Carolina at Asheville. She lived in Asheville until she left for college. Her parents still live there today and she has been staying with them in the house she grew up in since being released on May 1, 2020.

As a child, Tricia "excelled in academics and athletics." Ex. 5 at 1. Her mother writes that Tricia "always had a tenacity and perseverance that astonished us as parents. Trish would stick to whatever was the task at hand until she got it right. She seemed to have an inner drive that would never let up until she got it done. She never seemed to have the attitude 'ok, that's good enough' whether it was her school work, or a project, or the current sport, or whatever." Ex. 6 at 1. Caroline Dean, who has known Tricia since she was eleven, writes that Tricia has always been "diligent, intelligent, and focused." Ex. 7. The librarian of Tricia's elementary school remembers her as a "bright student, one who stood out among her peers, already established in character and work ethic." Ex. 8 at 1.

Growing up, Tricia "was outgoing and had many friends." Ex. 6 at 1. Her neighbors Jack and Diana Brinkley observed that "Tricia was an excellent leader, always very positive and fun to be around." Ex. 9 at 1. A lifelong friend Kim Hunt says Tricia has "always been someone who wants to do her best, holds herself to a high standard, and builds a team around her." Ex. 10. And she inspired those around her to do better. *See* Ex. 11. A family friend knows her as "thoughtful, diligent and committed to her responsibilities." Ex. 12. She was "good" and "well-behaved" as a child. Ex. 5. Noting that she had a daughter the same age as Tricia, her Aunt Karin "considered [Tricia] to be a good influence on my daughter." *Id.* Barbara Hawkins' daughter was in church youth activities with Tricia as a teenager, where she "witnessed [Tricia's] loyalty, generosity, and kindness to friends. She was a strong, but caring, leader for her group." Ex. 13. During high school, Tricia faithfully attended meetings of the Fellowship of Christian Athletes held by her neighbors Jack and Diana Brinkley and helped at FCA summer camps.[2] Ex. 9 at 1. The Brinkleys

---

[2] The FCA is a non-profit interdenominational Christian organization ministering to coaches and athletes. *See* https://www.fca.org/aboutus/who-we-are/vision-mission.

also recall fondly that Tricia babysat their two daughters, and even gave them hand-me-down clothing, which they loved. *Id*.

Excelling in sports as well as academics, she played soccer, tennis, and softball growing up, but "[h]er favorite sport was basketball, and it was a joy to watch her play." Ex. 5 at 1. Her love of basketball started when she was around three years old when her dad cut the bottom out of a plastic bucket and nailed it to a tree so she could shoot baskets. Ex. 6 at 1. Hall of Fame basketball player "Pistol" Pete Maravich nicknamed her "Trish the Dish" at a basketball camp when she was six or seven years old "for her selflessness in doling out the assist." Ex. 2 at 1. On her high school team, she was an "outstanding basketball player," a "coach's dream." Ex. 8 at 2. But it was not only natural talent; Cornelius "Kees" Auer, Tricia's high school weightlifting coach, recalls her as a hard worker in the weight room, "punctual [and] disciplined in her workouts," but "without complaining and always having a smile on her face." *Id.* at 1.

Many of Tricia's childhood attributes were outwardly praiseworthy. Describing Tricia's successes, her mother says "everything [she] touched turned to gold," but that was "because she worked so hard." Ex. 6 at 1. But this drive often went too far. On the one hand, she was a 4.0 student, but on the other hand, she felt that a 4.0 was "insufficient." Inside herself, she struggled. She was "perfectionistic, self critical, and anxious" from a very young age. Ex. 1 at 3. Despite her successes, Tricia describes her own childhood as "hard," admitting that it "was mostly self-inflicted. By pushing myself to the limits—I should not have had those expectations at that age . . . I didn't have perspective on what was realistic." *Id.* Good was never good enough.

As a teenager, Tricia suffered from ███████████████████████████████.
Tricia also experienced her first trauma as a teenager when ████████████████████
████████████████████████████████████████████████████████████████



████████. Ex. 1 at 8. *See also* PSR at 15 ¶ 74. Tricia's struggles became bad enough as a teenager that she ██████████████████████████████████████████ ███████████████████████████████████████, this was just the beginning of Tricia's struggles with her mental health. Dr. Linda Smoling Moore, a family friend who has known Tricia since she was born and a clinical psychologist, recalls ████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 14 at 1.

### B.  College, Meeting and Marrying Her Ex-Husband, and Law School

Tricia's hard work paid off when she was accepted into Duke University. She graduated high school in 1997 and enrolled at Duke that fall. She spent a summer of her college career studying at Cambridge University and then her junior year participating in an honors program at Oxford University, where she earned a Bachelor's certificate in Medieval and Ancient Philosophy. She later graduated *magna cum laude* from Duke in December 2000, with a double-major in philosophy and religion.

Tricia met her future husband ████████████ during the summer after her freshman year when she was studying the works of C.S. Lewis at Cambridge. At the time, she was still dating her high school boyfriend. But ██████ was persistent, starting a year-long "letter writing campaign" to convince her to end her relationship with her boyfriend. Ex. 1 at 4-5. *See also* Ex. 15 at 1.

Tricia returned to England for her junior year of college, this time to study at Oxford. ██████ was supposedly planning to transfer to a Ph.D. program there but told Tricia he could not come because his funding fell through. Once she was there, however, Mr. Boutros showed up, unannounced, and surprised her late at night by knocking on her door with a video camera. Mr.

Boutros apparently had been following her around for a week. Ex. 1 at 5. After spending the academic year together, Tricia and Victor became engaged.

Tricia graduated from Duke in December 2000, after only three-and-a-half years. Within days after graduating, Tricia and Victor married on December 22, 2000, in Asheville, North Carolina. PSR at 15 ¶ 75. Tricia was twenty-one years old. Tricia then moved to Chicago, where Victor had already started law school, and joined him at the University of Chicago Law School the following fall. It was not long, however, before signs of trouble emerged.

During a psychological evaluation interview in preparation for sentencing, ████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

Celeste Bozo[3], a law school classmate and neighbor of Tricia and Victor in Chicago during law school, has written a letter describing an incident that occurred during law school. *See* Ex. 16. █████████████████████████████████



*Id.*[4]

---

[3] Ms. Pozo is currently Lead Counsel at the Inter-American Development Bank. *See* https://www.linkedin.com/in/celeste-pozo/.

[4] █████████████████████████████████████

██████████████████████████████████████

From Ms. Pozo's perspective, █████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

Around the same time, Tricia and Victor lived with family friend Dr. Smoling Moore in the D.C. suburbs of Maryland during Tricia's internship with a D.C. law firm and Victor's internship at the Department of Justice. *See* Ex. 14. Dr. Smoling Moore observed that, "as a young woman, in addition to her many strengths, I found she was perhaps overly trusting, anxious to please and overly compliant." *Id.* at 1.

### C.  Tricia's Career, Children, and Struggles with Addiction

#### 1.  *Tricia Begins Her Law Career at Vinson & Elkins*

Out of law school, Tricia was hired in 2004 by the international law firm of Vinson & Elkins LLP, based in Houston, Texas. She worked as a corporate attorney, eventually specializing in Middle East finance and learning Arabic. She began work in Vinson & Elkins' Dallas Office, but she eventually moved to the Washington, D.C., office in August of 2007, just before ███ was born. She also spent longer stints working in the Dubai, London, and Shanghai offices of the firm.

When she did finally get that high-paying job, she bought her parents a brand new car, a 2003 Nissan Altima, which her mother proudly brags they "are still driving 17 years later," "the

---

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

best and longest lasting car we have ever had." Ex. 6 at 1. She flew her brother Sam to Dallas to

visit her and her family, where they were able to grow closer after growing apart. Ex. 2 at 1. She

helped with his medical bills. *Id.* at 2 (Sam). And when she was working in Dubai, she flew Sam

out to stay with her, an "act of generosity" that to her brother "was and remains all these years as

one of the coolest experiences in my life, and the source of many fond memories." *Id.* at 1.

### 2.   *Tricia's Pro Bono Work for the International Justice Mission.*

Both during law school and her early legal career, Tricia found purpose in pro bono work

combating human trafficking with the International Justice Mission (IJM). IJM is a human rights

organization whose mission is to "rescue victims of violence, sexual exploitation, slavery, and

oppression." Ex. 17 at 17. As part of its work, young American lawyers have the opportunity to

assist local authorities with the investigation and prosecution of human traffickers. With the IJM,

Tricia "went to India twice, visiting Tamil Nadu and Chennai and Mumbai, and to Thailand and

to South Africa." Ex. 6 at 2. She even brought her brother along on a trip to India, who recalls it

as one of the "most special weeks of my life, and was responsible for reshaping my perspective

on the world." Ex. 2 at 1-2.

Duke Magazine, the university's alumni magazine, featured an article about Tricia's

work in 2002, while she was still in law school. *See* Ex. 18. The article recounts Tricia's

participation in an investigation of bonded labor in the gem industry in the south Indian city of

Trichy. Tricia explained in the article:

> It's good to put yourself in a position where you can care about something
> besides getting good grades and getting a good job, because that can be a
> bondage all of its own. Its helps to get outside the world you live in. I'd
> rather spend my time caring about the people we met this week.

*Id.* at 4.

In 2006, the Texas Bar Journal featured an article about a two-week trip that Tricia took with ▮▮▮ and other Texas attorneys to South Asia. *See* Ex. 19. During the trip, the young lawyers helped local prosecutors prepare for hearings and helped document evidence for a case that freed forty-eight slaves. Afterward, Tricia was invited to be the main speaker at Vinson & Elkins' global firm-wide conference to speak about her second trip to India. Ex. 6 at 2. Tricia gave a PowerPoint presentation to the entire firm of Vinson & Elkins regarding her work for IJM. Ex. 17 at 21.

In 2007, Tricia was featured in the JD Journal. *See* Ex. 17. In the article, Mr. Boutros recounted the same case involving freeing forty-eight slaves and how he and Tricia "got to play a small role in the culmination of a two-year investigation with IJM and the local law enforcement which resulted in a raid of two particularly brutal rice mills. . . And on that day, we got to meet 48 people who had been slaves, most of them all their lives, on their first day of freedom." *Id.* at 21.

In recognition of her pro bono work for IJM, Tricia was later inducted into the State Bar of Texas Pro Bono College. *See* Ex. 20.

### 3. *The Start of a Family and a Struggle with Addiction*

In the middle of her busy career, Tricia also found time to start a family. When Tricia was eight months pregnant with her first child in 2007, and a busy mid-level associate, ▮▮▮ was hired by the Department of Justice, requiring the family to move to the Washington, D.C., area. When ▮▮▮ went to D.C. for training, Tricia "had to manage the sale of their house in Dallas and find rental housing in Arlington, Virginia, alone, with only the help [her parents] were able to offer." Ex. 6 at 2. Tricia's parents traveled from North Carolina to help with the move and unpacking.

11

Tricia's daughter ███ was born in ███████, just as Tricia was beginning her fourth year at Vinson & Elkins. ███ will soon turn █. Tricia "was a very attentive mother." Ex. 9 at 1. Family friend Barbara Hawkins relates that "[h]er unconditional love for her children was evident to me as I saw them when she visited her parents." Ex. 13.

After ███'s birth, in approximately December 2008, Tricia began to experience shooting pains in her arms and down her left leg. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████ *See* PSR at 20 ¶ 96.

Although she tried ████████████████████████ ████████████████████████████████████ ██████████████ Following ██████'s birth, however, Tricia was prescribed ████████ ████████████████████████████████████ ███████████████████████████████████. 

Just a few weeks after ██████ was born, as Tricia ████████████████████ ██████, she had to coordinate another household move, this time to a newly built home in Alexandria, Virginia. Again, ██████ was not there to help. Ex. 6 at 2. Her father recounts:

> Tricia was now visibly distressed by ██████ extended work absence again during this move, a move which involved many more details of closing on the purchase and extra work of having small construction issues resolved. My wife and I again came to help. During both of these moves Tricia had also been successfully engaged in her corporate law work.

Ex. 15 at 2. Tricia's father "ended up staying there for 5 weeks so she was not alone with the baby and a 2-year-old." Ex. 6 at 2.

In September 2010, she turned to her husband for help with ████████████. She has reported that ████ ████████████████████████████████ ████████████████████.[5] Within ten days ████████████████████ ████████████████████████████████████████ ████████████████████. *See* Ex. 1 at 9.

████████████████████████████████████ ████████████████████. PSR at 20 ¶ 96. Tricia admitted to the Probation Office in information she provided that ████████████████████ ████████████████████.

████ continued ████████████████. Although Tricia would often call her parents, telling stories of their grandchildren, Tricia's father reports that, "[a]t some point Tricia indicated that ████ was not happy about her talking so much with her mother." Ex. 15 at 2. ████ also coerced Tricia into depositing her firm salary directly into an account in his name only, based on his purported concern that Tricia "might be using the 'family finances' to purchase dangerous drugs." *Id.* This continued up through the time that he demanded separation, custody of the children, and divorce. Tricia never regained any control of the family's finances.

In November 2010, Tricia ████████████████████ ████████████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████. *See* PSR at 20 ¶ 98.

---

[5] ████████████████████████████████████████

Tricia went directly from ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

Tricia ███████████████████████████████████████████████

███████████████████████████████████████. After struggling ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████. Her diagnoses included █████████████████████████████

████████████████████████████ PSR at 19 ¶ 90. Tricia returned home in

February of 2014. Following her ██████████████████████████████

██████████

In March 2015, after █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ As her father

notes in his letter: "Unknown to Tricia at this time, she would never again return home to her

children." Ex. 15 at 2.

Following ███████████████████, Tricia then went directly to ████████████████,

███████████████████████████████████████████. From

█████████████████████, ████ wanted her to go for █████████████████████. *Id.* 2.

Against his wishes, she went to ██████████████████████████████



██████████████████████ until September 2015. While ██████ continued to receive disability payments from Tricia's law firm, Tricia's parents had to finance Tricia's ██████ by borrowing from a family member. *Id.*

### D.     Separation, Divorce, and Tricia Loses Custody of Her Children



In May 2015, just days after Tricia was ████████████████████████████ ██████████████████████████████, ██████ told Tricia by phone that he did not want her to return to the house once she was done with her therapy and that he ███████████ ███████████████████████████ While Tricia was in ████████████ and without the advice of counsel, ██████ convinced her to sign an order drafted by his lawyers giving him sole legal and physical custody of the children, with limited visitation to be supervised by ██████ himself. *See, e.g.,* Ex. 15 at 2. Visitation was conditioned strictly upon Tricia's sobriety and drug testing, among other conditions. On June 12, 2015, the order was entered by the City of Alexandria Juvenile and Domestic Relations Court. *See* Ex. 21. As Tricia's father notes, "[i]t was becoming clear that ██████ never intended for Tricia to return to her own home to be with the kids." Ex. 15 at 2. After a period of sporadic visits, eventually visitation was denied in its entirety in the summer of 2016. Since then, Tricia has not seen or heard from her children.

"Being totally cut off from visitation or any communication with her children (██████ and ████████) has torn her heart out." Ex. 6 at 2. Her mother reflects that she and Tricia's father "don't know how [Tricia] has lived through the betrayal and brokenness of the past 4 years, other than by the grace of God." *Id.* Tricia's mother also notes that she and her husband "share in the heartache because we as grandparents are also totally cut off from Eva and Lawson." *Id.* Her Aunt Mary concurs, reflecting that Tricia "was devastated when she was ordered not to see her children, and remains extremely despondent not being able to even communicate with them." Ex. 22.

15

Cherie Morris, a divorce consultant working with Tricia since 2018, writes: [I]t seems clear to me that the loss of her children was likely the most traumatic event in a life filled with no small amount of trauma. The change in Tricia's demeanor and appearance from just a few short years earlier was stark and apparent . . . ." Ex. 23 at 1.

> It was only after she lost custody of her children, and all access to them at all, that her already fragile sense of self broke down entirely. Although highly intelligent, her emotional distress was so acute that she had trouble speaking. Her evident anxiety was her most pronounced characteristic. . . . [E]ven talking about her children, and the loss of them, felt like new trauma to her.

*Id.*

Following bitter and expensive litigation, including numerous subpoenas issued by ███'s lawyers to pharmacies, Tricia's healthcare providers, and her employer, the divorce decree was entered on March 27, 2016. *See* PSR at 15. ███ has remained in the home in Alexandria, Virginia, since Tricia left for ███████████ in May 2015, and Tricia has never returned. The house remains jointly owned by Ms. Boutros and her ex-husband, but she has not been compensated for her ownership or rent. She has also not been able to retrieve any of her personal belongings. When Tricia returned and rented an apartment in D.C., her mother had to lease an automobile for her because ███ would not let Tricia use one of the family cars. *See* Ex. 15 at 2.

In March 2016, again while Ms. Boutros was *pro se*, an order for pendente relief was entered by the Circuit Court of Alexandria ordering Tricia to pay $4,000 per month in child support to ███████. Included in the order was an obligation to pay $4,000 retroactively for February and March 2016. Ex. 24. Throughout this time, ███ was unemployed. *Id.* at 3. The order was eventually changed to $2,500 per month. Tricia continues to owe $2,500 per month in child support even today, as arrears keep piling up every month.

16

In June 2016, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Around the same time, █████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

The financial pressure on Tricia was tremendous. Despite the fact that she no longer had her firm salary from Arent Fox, she continued to be obligated to pay $2,500 per month in child support. In addition, ██████ demanded that she pay a $37,000 credit card bill on his credit report because he claimed it had been used to pay child support to satisfy a contempt order. Unable to pay, the Circuit Court for Alexandria found her guilty of civil contempt and sentenced her to 30 days in jail on July 12, 2017. Ex. 25. She was released a few days later, after her parents took out a personal loan to pay the ordered amounts.

"For the next few years Tricia continued the solitary battle in her apartment, obsessed by a seemingly futile struggle to somehow be reunited with her children." Ex. 15 at  3.

In June 2019, after a search warrant had been executed at her apartment and she had been interviewed by the FBI on May 29, 2019, Tricia ██████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

### E.    The Offense Conduct

As noted, Ms. Boutros has pleaded guilty to one count of bank fraud. The offense conduct is detailed in the Statement of Offense that accompanied Ms. Boutros's plea agreement, ECF No. 38, as well as the PSR, ECF No. 45 at 5-11. Ms. Boutros accepts full responsibility for

her criminal conduct and is deeply remorseful for the financial and economic damage she has caused.

It should be noted that, before her guilty plea, Ms. Boutros and the government had been in active plea negotiations since well before her initial charge in October 2019. Although Ms. Boutros did not plead guilty until May 1, 2020, she had resolved to plead guilty a couple of months before she signed the plea agreement. In the interim, the parties spent time negotiating forfeiture and restitution in the hopes of definitively resolving those issues as part of her plea. Her case never advanced to a preliminary hearing as Ms. Boutros repeatedly agreed to toll her Speedy Trial deadlines in order to reach a plea agreement.

## F.    Arrest and Pretrial Detention

On October 28, 2019, Ms. Boutros turned herself in at the FBI's D.C. headquarters after negotiating her surrender through counsel with the U.S. Attorney's Office. After being released, Ms. Boutros continued to work with her counsel on her case and she reported to Pre-trial Services twice weekly, including for weekly drug testing.

On December 11, 2019, Magistrate Judge Deborah Robinson revoked Ms. Boutros's pretrial release. She was taken into custody immediately and taken to the D.C. Correctional Treatment Facility, where she would remain until her release following her guilty plea on May 1, 2020.

Being incarcerated was a rough awakening for Tricia. The first visits by counsel vacillated between uncontrollable sobbing and hard work to understand her case, the evidence disclosed by the government, and her legal options. But Tricia eventually adapted to her environment, and also became sober and drug-free. Saulina Eady notes in her letter that Tricia "settled in with a group of girls who hosted a bible study group and played cards." Ex. 26 at 1.

Once sober and safe from trauma, Ms. Boutros became much like her old self but more fulfilled. She started playing basketball again, or at least until the COVID pandemic stopped such activities. Undersigned counsel recalls during one visit to CTF Ms. Boutros proudly showing off a large scrape on her elbow she said she got while playing basketball.

Most notably, she invested in helping those around her. Ms. Eady speaks of the time Tricia's "eyes brightened" when Ms. Eady brought out a philosophy textbook, learning that Tricia "is a phenomenal scholar in the subject." *Id.* Tricia kept the women "in good spirits with her jokes and impersonations." *Id.* at 1-2. "She shows compassion for women along the lines of a mentor with friend-like qualities." *Id.* at 2.

Jessica Gonzalez writes in her letter that she herself was "terrified" when she arrived at CTF, but Tricia and two other friends offered to help her. Ex. 27 at 1. Ms. Gonzalez says how thankful she is for all that Tricia did for her, noting that Tricia gave Ms. Gonzalez food and shared her things. *Id.* Ms. Gonzalez reflects that Tricia "is a caring, loving, helpfull (sic) respectful friend and woman with a great heart." *Id.*

Ashley Iverson reports that Tricia "is such a gem. Kind, funny, helpful & silly. She always made things seem happier around here. She has a truly kind and loving heart. She listens and was always encouraging even though her worlds was a mess also." Ex. 28.



Tricia's Aunt Mary Bonazzi shared that Tricia "is a very helpful person, thinking of others over herself, even while she was incarcerated. She shared with the other inmates cards, gifts and scriptures that were sent to her from family and friends." Ex. 22. She asked her Aunt Karin for Bible study materials to share with the women with whom she was incarcerated. Ex. 5 at 2. Barbara Hawkins writes that she "was fearful for Trish as she entered prison, but the women in her unit accepted her and were kind to her." Ex. 13. Recounting letters from the women in the unit, Ms. Hawkins states that they "all express the blessing Trish was to them, and how she

encouraged them to persevere and to have hope. They tell of how she unselfishly gave of herself to them as they experienced tough times." *Id.*

### G.     Her Support Network and Outlook

Tricia has a large and close extended family that is ready to support her, as shown by the many support letters from her family. Ex. 3 at 2. Tricia's cousin Bethany Mandell has expressed her belief "that Tricia has the critical resources which are required to return to and proceed with a positive and productive life." *Id.* She explains that Tricia's "faith, family, strong work ethic, and professional drive and discipline" will "provide what I believe are the most significant resources for her to draw on." *Id.*

If Tricia were to be sentenced to home confinement, she would live with her parents at their home in Asheville, North Carolina. Her parents are in good health and able to provide for her needs. Friends describe Tricia's parents as "exemplary in the practice of true faith, trust and love." Ex. 8 at 2. Coincidentally, Tricia's father has previously volunteered in a prison ministry. Ex. 14 at 1. Tricia's father writes that he and his wife "have had the joy of caring for Tricia these past few months as she awaits sentencing, and we have seen glimpses of the 'old' brilliant, outgoing Trish." Ex. 15 at 3.

In addition, Ms. Morris states her belief that Tricia "is committed to addressing her current limitations. Tricia has a lot she can offer her community and her children. I hope she is given a chance to recover, as needed, and return to the best version of herself. I think both Tricia and her children will benefit from this." Ex. 23 at 2.

### H.     Psychological Evaluation

Dr. Sara Boyd was retained to perform a forensic psychological evaluation of Ms. Boutros. Dr. Boyd's evaluation report, including her findings and opinions, was filed as a

proposed sealed document on September 12, 2020. ECF No. 50. It is also included with this

memorandum at Exhibit 1. Dr. Boyd's curriculum vitae is appended to her report.











## II.   A SENTENCE OF TIME SERVED, PLUS SUPERVISED RELEASE WITH TWELVE MONTHS OF HOME CONFINEMENT WOULD BEST SATISFY THE STATUTORY SENTENCING FACTORS.

The Court must "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). Under Section 3553(a), the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996).

To reach such a sentence, the Court is to consider seven factors:

(1)     the nature and circumstances of the offense and the history and character of the defendant;

(2)     the purposes of sentencing, as reflected in the statute (and enumerated below);

(3)     the kinds of sentences available;

(4)     the applicable advisory sentencing guideline range;

(5)     pertinent policy statements by the Sentencing Commission;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to victims of the offense.

18 U.S.C. § 3553(a).

Under the second factor, the purposes of sentencing include "the need for the sentence imposed—

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"

18 U.S.C. § 3553(a)(2).

The Guidelines, of course, are but one among the seven factors listed in Section 3553(a). Although the Guidelines may serve as a "starting point," they are not "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Courts should not presume "that the Guidelines range is reasonable." *Gall*, 553 U.S. at 50. The Court may consider arguments that a "Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007). Moreover, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Gall*, 553 U.S. at 47. Instead, the Court is directed to determine a sufficient sentence after "mak[ing] an individualized assessment based on the facts presented" in the particular case. *Id.*

The advisory guideline range offers little useful guidance here because it (1) is the product of a base offense guideline (Section 2B1.1) that is not based on empirical evidence or national experience; (2) fails to fully account for Ms. Boutros's specific circumstances, including her mental and emotional health and her statistically low risk of recidivism; (3) would result in

unwarranted disparity as compared with sentences for similarly situated defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

As discussed below, departures under Section 5H1.3 and/or 5K2.13 are appropriate in this case due to Ms. Boutros's mental and emotional conditions and their contribution to the criminal conduct in this case. If the Court determines that a departure under one of these sections is not warranted, the Court should nevertheless sentence Ms. Boutros to a period of home confinement based on a downward variance after taking into account the Section 3553 factors. In truth, in the post-*Booker* world, there is not practical difference between a departure and a variance. *See Gall*, 552 U.S. at 50 (using "departure" and "variance" interchangeably in describing a district court's decision to sentence a defendant outside the Guidelines range, noting that the court must "ensure the that justification is sufficiently compelling to support the degree of the variance," while noting in the next sentence that "a major departure should be supported by a more significant justification than a minor one"). *See also United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011) (noting that under *Gall* and *Rita* there is no practical difference between a variance and a departure).

### A. Nature and Circumstances of the Offense and Character of the Defendant

#### 1. The Nature and Circumstances of the Offense

Ms. Boutros fully recognizes the wrongfulness of her conduct in this case and the extent of her fraudulent conduct. The defense would nevertheless urge the Court to consider the differences between her case and the breadth of cases covered by the Guidelines range applicable to this case before any departures.

For example, eighteen (18) of the thirty-one (31) offense levels before adjusting for acceptance of responsibility are generated by loss amount. Under Section 2B1.1(b)(1), the stipulated loss amount of at least $3,500,000 was based on a total *intended* loss amount. *See*

Section 2B1.1 n. 3(A). As recognized in the PSR, Ms. Boutros has agreed to an *actual* loss amount of only $1.3 million, a little more than one-third the total intended loss. PSR at 4 ¶ 6. Much of the intended loss was generated as Ms. Boutros failed repeatedly to obtain funds from various accounts but continued to attempt transfers as she was desperate for money. Yet, under the Guidelines, Ms. Boutros is considered equally culpable as a defendant who succeeded in inflicting $3.5 million in actual pecuniary harm. If Ms. Boutros's Offense Level were to be calculated using the actual amount of loss—less than $1.5 million—the total estimated offense level would be 24, instead of 28, and the Guidelines range would be fifty-one (51) to sixty-three (63) months, a twenty-seven (27) month decrease at the low end of the Guidelines range.

Moreover, Ms. Boutros has agreed to forfeit $496,054.41 that is traceable to proceeds of her criminal conduct.[7] To the extent that such funds will be used to compensate the victims in this case through restitution, the actual pecuniary loss she caused is even lower—about $800,000 dollars. Yet, she is in the same position under the Guidelines as a defendant who has completely dissipated more than $3,500,000 stolen from others.

Moreover, this case is not about greed. Against the backdrop of her mental illness and drug use, Ms. Boutros was motivated—and her fraudulent conduct was triggered—primarily by a misdirected effort to be able to see her children. In a text exchange from January 2017 that the government provided in discovery, Ms. Boutros states: "I actually hate doing this I really do it makes me feel bad about myself. And Id (sic) never do it just to get extra money or get rich, but honestly I would do anything for my kids." Ex. 31. All indications are that Ms. Boutros was motivated primarily by a desire to accumulate enough money to pay for legal counsel (including

---

[7] This amount includes $462,985.41 in cash seized by the government from accounts owned by Ms. Boutros and $33,069 in proceeds from the sale of an automobile.

her husband's counsel, it appears) in her divorce and custody proceedings, to satisfy the financial demands of her husband and the court overseeing her family law case, and to pay for ordinary expenses like her rent. For example, in April 2017, and shortly before she was jailed for contempt, she attempted to pay ██████ $30,000 with a fraudulent check. In another exchange provided by the government from September 2017, Ms. Boutros states: "15K to my landlord and 38K to [███████]." When the other party she was texting asks, "Wow really?," Tricia responded: "i owe way more than that though." Ex. 32.

To this end, Ms. Boutros did not purchase luxury items or fritter the money away on travel or other conspicuous consumption. The biggest expenditure Ms. Boutros undertook was to purchase a 2018 Volvo, a compact SUV. Ms. Boutros bought that car because it was similar to a car she previously owned that her son loved and called the "rocket ship space car." She rarely drove the car. She had hoped that if she were to be reunited with her children, they would enjoy riding in the car—that it would be the new "rocket ship space car."

These differences from the mine run of cases should be accounted for through a downward variance from the Guidelines.

### 2. *The Character of the Ms. Boutros*

The Court should recognize that the criminal activity Ms. Boutros undertook is a complete break from her past life as described above, a life filled with achievement, friendship, faith, and good deeds. A lifelong friend reflects: "While [Tricia] is pleading guilty to a crime, this does not define who she is or reflect who she has been over the course of her life." Ex. 10.

People who have known her entire life are effusive in their praise of her. They say things like—Tricia "has a sharing and caring heart." Ex. 9. She "is a very helpful person, thinking of others over herself, even while she was incarcerated." Ex. 22. She "has an infectious smile and humble heart." Ex. 9 at 2. Her uncle, Dr. James Mandell, the President and CEO emeritus of

Boston Children's Hospital and a Harvard Medical School Professor, states that Tricia "always exhibited an enthusiasm and reverence for life in all of its aspects." Ex. 33. She has always had a strong Christian faith, which is "a guiding force in her life." Ex. 10. Dr. Smoling Moore writes that, "although [Tricia] has succumbed to destructiveness, she is not a destructive person. . . She is a talented, caring, and capable woman who in my opinion is capable of such change and has the capacity to make significant contributions back to society." Ex. 14 at 1-2.

Ms. Boutros lived a law-abiding life until the instant offense began. She did not engage in any criminal conduct. Her offense is completely uncharacteristic when viewed in the context of her entire productive adult life. This Court should grant a variance based on the aberrant nature of her conduct. *See, e.g., United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (upholding a variance based on "isolated mistake" in otherwise long and entirely upstanding life despite engaging in a two-year cover up); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (upholding six-level downward departure based in part on fact that the defendant was a "law abiding citizen, who [did] an incredibly dumb thing").

Moreover, Ms. Boutros is fully contrite for her conduct, as she plans to recognize in her personal statement to the Court.

### B.     The Purposes of Sentencing

The purposes of sentencing can be met in this case through the requested sentence of time served, with a substantial term of supervised release, a part of which is served in home confinement.

Importantly, as an overarching matter, Ms. Boutros's mental and emotional conditions may be addressed through considerations under Section 3553(a)(2). *See United States v. Miranda*, 505 F.3d 785, 793-94 (7th Cir. 2007). For example, "mental illness . . . might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a

31

significant general deterrent effect on persons in the defendant's class." *Id.* at 793. If the Court determines that treatment will make a person suffering from a mental illness less inclined to commit crimes, the defendant "does not require the added encouragement of a lengthy sentence." *Id.* "If the mental illness is treatable, . . . the goal of incapacitation may not be advanced by a heavy sentence. Instead, mental health treatment would 'incapacitate' [the defendant] from committing further crimes." *Id.* Finally, "a person who would not have committed a crime but for his mental illness would be less deserving of punishment because he is not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired." *Id.* at 793-94 (internal quotation marks omitted).

### 1.    *Need for Just Punishment in Light of the Seriousness of the Offense*

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his or her degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005). The Guidelines include none of these factors bearing on Ms. Boutros's degree of culpability.

Measured by these factors, Ms. Boutros's degree of culpability is low compared to typical cases. As discussed above, Ms. Boutros's motives centered around a desperate desire to satisfy mounting financial obligations related to her divorce and custody proceedings so that she could get access to her children back. Moreover, as also discussed above, Ms. Boutros's mental and emotional state contributed substantially to her criminal conduct, or at least clouded her rational decision-making.

Ms. Boutros has also already been punished substantially. As the Probation Office has reviewed, "Ms. Boutros is now a convicted felon, which may preclude her from certain employment opportunities, and she has lost her voting and firearm privileges." ECF No. 46 at 2. Moreover, Ms. Boutros's conviction and her sentence will undoubtedly harm her efforts to reunite with and gain joint custody of her children before they are adults. Courts have considered such collateral consequences in deciding a just sentence. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered under Section 3553(a)(2)(A) that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession) (internal quotation marks omitted); *United States v. Virgil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate in part where defendant lost his position and reputation); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost public sector job as a result of conviction); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993).

In addition, Ms. Boutros's pretrial detention was especially harsh. A little more than halfway through her pretrial detention at the Correctional Treatment Facility, the COVID-19 pandemic struck. The D.C. jails responded by imposing severe restrictions on inmates in an effort to prevent spread. Inmates were restricted to their cells for most of the day, what some refer to as either "22 and 2" or "23 and 1," referring to the number of hours inmates spend in their cells versus out of their cells. Time for phone calls was limited. All programming was suspended. In speaking with a female inmate recently, undersigned counsel learned that CTF is still restricting inmates to their cells for most of the day. Legal "visits" from counsel were restricted to phone calls, limited in duration, and with no easy way to review documents. In a motion for a temporary restraining order filed in March 2020, a group of plaintiffs/petitioners

recounted the dangerous and unsanitary conditions to which inmates were subjected, including

unavailability of hand sanitizer (due to a ban on alcohol), inability to socially distance, lack of

soap, a lack of sanitization of surfaces, and an absence of personal protective equipment for

inmates. *See Banks v. Booth*, No. 1:20-cv-00849-CKK, ECF No. 5 at 9-18. These conditions not

only created a dangerous environment; it forced Ms. Boutros and other inmates to live in a

constant state of fear that they would contract COVID-19. The fact that Ms. Boutros endured

such harsh conditions during pretrial detention should be considered when contemplating how

much additional punishment she should receive.

### 2.      *Need for Deterrence*

Research has consistently shown that while the certainty of being caught and punished

has a deterrent effect, "increases in severity of punishments do not yield significant (if any)

marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime &

Just. 1, 28 (2006); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice*

*Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447

(2007) ("certainty of punishment is empirically known to be a far better deterrent than its

severity"). Such findings support the notion that the requested sentence in this case is sufficient

deterrence, both generally and with respect to Ms. Boutros specifically.

Typical of the findings on general deterrence are those of the Institute of Criminology at

Cambridge University. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence*

*Severity: An Analysis of Recent Research* (1999). The report examined penalties in the United

States as well as several European countries. *Id.* at 1. Specifically, the authors focused on the

effects on deterrence of changes to both the certainty and severity of punishment. *Id.* While

studies generally showed "significant negative relationships between likelihood of conviction

and crime rates," "[t]he negative correlations between sentence severities and crime rates . . . are not sufficient to achieve statistical significance." *Id.* at 45.

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1997); *see also* Z. Gabbay, *supra*, at 448-49 ("there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"). According to "the best available evidence, … *prisons do not reduce recidivism more than noncustodial sanctions*." Francis T. Cullen, *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S (2011) (emphasis in original). *See also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaaid, J., dissenting) ("the disutility of being in prison at all [in white collar cases] and the stigma and loss of earning power may depend relatively little on the length of imprisonment" (emphasis in original) (citing A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 38 J. Legal Stud. 1, 12 (1999))).

The need for deterrence through further imprisonment in this case is low. Ms. Boutros's arrest, booking, the humiliation of being brought before a court for criminal charges, the revocation of her pretrial release and subsequent detention, admitting guilt publicly, and now coming before this Court for sentencing have been a life-altering experience for Ms. Boutros, who had never previously had any exposure to the criminal justice system. These experiences alone will serve as strong deterrents from engaging in even questionable conduct going forward. Moreover, Ms. Boutros is now receiving appropriate mental health treatment for perhaps the first

time in her life that will further ameliorate any concern that she will re-offend. Given her the

many unblemished years she lived without even an allegation of criminal wrongdoing, and the

circumstances that led to her criminal conduct in this case, the requested sentence is more than

enough to deter Ms. Boutros from future criminal activity.

### 3. *Need for Incapacitation*

In imposing the least sentence sufficient to account for the need to protect the public from

further crimes of Ms. Boutros, this Court should again consider the statistically low risk of

recidivism presented by Ms. Boutros's history and characteristics. *See, e.g., United States v.*

*Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on a basis of

Defendant's first-offender status); *United States v. Urbina*, No. 06-CR-336, 2009 WL 565485,

*3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by Defendant's lack of

criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F.

Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal

history points are less likely to recidivate than all other offenders").

First offenders like Ms. Boutros with zero criminal history points have a rate of

recidivism nearly half that of offenders with one criminal history point. *See* Sent'g Comm'n,

*Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*], *available*

*at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2004/200405_Recidivism_First_Offender.pdf. Indeed, the Commission has

recognized the advisability of revising the guidelines to take first offender status into account.

*See First Offender*, at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept

within the guideline criminal history structure"). *See also United States v. Qualls*, 373 F. Supp.

2d 873 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a

defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time . . . .").

The Court will be able to craft sufficient conditions of release to prevent any risk that Ms. Boutros would be capable of conducting this type of fraud going forward, including mental health treatment.

### 4.    Rehabilitation

As discussed more fully above, Ms. Boutros would benefit most from mental health treatment in the community. Dr. Boyd has recommended that Ms. Boutros continue ████████ ████████████████████████████████████████████████████. Ex. 1 at 18. Dr. Boyd further recommends that, once Ms. Boutros is ██████████████████████, "she would benefit from participating in ████████████████████████████████████████████ ████████████████████████████████████." *Id.*

As discussed more fully below with respect to the requested departures, both Dr. Boyd and Ms. Boutros's treating psychiatrist have expressed concerns about whether Ms. Boutros will receive adequate care while incarcerated. *See* Ex. 1 at 19-20. For example, Dr. Boyd notes that



*Id.* at 20. At the very least, the Court should delay Ms. Boutros's reporting date in order to ensure that she has been stabilized on her medication regimen.

### C.    Need to Avoid Unwanted Disparities and Unwarranted Similarities

The Court must also consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). This suggests that the Court should avoid unwarranted *similarities* in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall*,

552 U.S. at 55 ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"); *Ovid*, 2010 WL 3940724, *8 (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), *and* unwarranted differences among defendants whose conduct and characteristics are similar. *See Parris*, 573 F. Supp. 2d at 753, 756-62.

One study of sentencing data revealed that, "as the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases." Mark W. Bennett, et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 943-44 (2017). Citing 2012 sentencing data collected by the Sentencing Commission, Judge Bennett and his colleagues observed that, "as the loss increases, so does the gap between the average guideline minimum (which increases rapidly) and the average sentence (which increases less rapidly)." *Id.* at 963. For example, in 2012, only about 34 percent of offenders with loss amounts between $2.5 million and $7 million were sentenced within or above the Guidelines range. U.S. Sentencing Comm'n, Sentencing and Guideline Application Information for §2B1.1 Offenders (2013), at 8.[8] More recent data using the U.S. Sentencing Commission Data Analyzer shows that during the period from 2015 through 2019 only between 40.1 percent and 43.1 percent of offenders in Criminal History Category I have sentenced within their Guideline range under Section 2B1.1.[9]

---

[8] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Sentencing_Guideline_Application_Info.pdf.

[9] The Interactive Data Analyzer is available at https://ida.ussc.gov/.  Counsel used the "Guideline Application" tab and set the filters to Guideline § 2B1.1 and Criminal History Category I.

In *Parris*, Judge Block in the Eastern District of New York took a collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. Based on collection, the Court concluded that offenders who were not cooperators and "whose losses were less than $100 million were generally sentenced to single-digit terms." *Parris*, 573 F. Supp. 2d at 753. The Court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was just 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

Within this universe of similar cases, Ms. Boutros's case is unique. Her case presents far more—and more serious—mitigating circumstances than a typical white-collar case. A sentence within—or even near—the Guidelines range would fail to reflect the unique circumstances of her case.

### D.    Kinds of Sentences Available

There is no statutory minimum sentence of imprisonment in this case. The Court may impose a term of supervised release of up to five years. 18 U.S.C. § 3583(b)(1). *See also* PSR at 26 ¶ 138. The Guidelines call for a term of supervised release of between two and five years. U.S.S.G. § 5D1.2(a)(1). Under Section 5D1.3(e)(2) of the Guidelines, the Court may impose home detention as a condition of supervised release. *See also* U.S.S.G. § 5F1.2 (home detention). Under Section 5F1.2, the Guidelines specifically state that such a condition of home detention may only be imposed "as a substitute for imprisonment." In other words, the Guidelines specifically contemplate that a Court may impose supervised release with home confinement instead of a term of imprisonment called for by the Guidelines.

In addition to the other reasons stated thus far, a variance to home confinement as part of supervised release is justified in view of the continuing dangers and prison conditions related to the ongoing COVID-19 pandemic. This Court is undoubtedly well familiar with the gravity of

this pandemic. As of the date of this sentencing memorandum, more than 6.5 million Americans have become infected with COVID-19. According to the Centers for Disease Control, more than 250,000 cases have been reported in just the last week. The CDC estimates that more than 194,000 have died from the pandemic thus far.[10]

But even as the American public continues to deal with the general crisis, the nation's prisons face much more dire circumstances. As reflected in the charts below compiled daily from data from the Bureau of Prisons and provided by the Federal Defenders of New York,[11] total COVID-19 cases in federal prisons are close to 14,000. The infection rate of 86-per-1000 inmates is more than four times the rate of the general population of the United States (around 20-per-1000). Cases in the Bureau of Prisons have about doubled since approximately late June and early July of this year when they were around 7,000.

Although Ms. Boutros does not currently have diagnosed risk factors that would put her at higher risk of severe complications or death, this does not mean that the Court should not seriously consider the ongoing crisis in fashioning her sentence. The overall risks associated with adding more prisoners to the population when other sentences may be sufficient should be considered.

---

[10] https://covid.cdc.gov/covid-data-tracker/#cases_totalcases.
[11] https://federaldefendersny.org/.





In addition to health risks, the conditions of confinement are currently much harsher due to efforts to present the spread of COVID-19.

- Inmate internal movement is suspended with limited exceptions.

- Legal visits are suspended.

- Volunteer visits are suspended unless approved by the Deputy Director of the BOP. Alternate means of communication will be considered for inmates who request to speak with a religious advisor.

- Newly-arriving inmates are processed through quarantine or jail/detention sites and screened for COVID-19 exposure risk factors and symptoms; Asymptomatic inmates with exposure risk factors are quarantined. Symptomatic inmates with exposure risk factors are isolated and tested for COVID-19.

- Inmates are limited in their movements to prevent congregate gathering and maximize social distancing. Inmate movement in small numbers is authorized for commissary, laundry, showers three times per week, telephone and TRULINCs.

Inmate movement "is still expected to allow, when necessary, for the provision of required mental health or medical care."[12] Although social visitation is supposed to resume by October 3, 2020, "visits will be non-contact and social distancing between inmates and visitors will be enforced, either via the use of plexiglass, or similar barriers, or physical distancing (i.e., 6 feet apart)."[13] Inmates are essentially cut off from any physical contact with loved ones, which could go on indefinitely.

Given the situation with the pandemic, if the Court should determine that a term of imprisonment is necessary to meet the purposes of sentencing, it may—and Ms. Boutros request that it would—reduce the duration of any prison term the Court might otherwise impose by substituting a period of home confinement at the beginning of supervised release so that she may minimize her exposure to COVID-19 within the Bureau of Prisons.

---

[12] https://www.bop.gov/coronavirus/covid19_status.jsp
[13] https://www.bop.gov/resources/news/20200902_visitation.jsp.

### E.   The Sentencing Guidelines

Among the factors listed in Section 3553(a), the Guidelines range in this case is perhaps the least useful in fashioning a sentence that is sufficient, but no more than necessary to serve the purposes of sentencing. As a preliminary matter, the Guidelines under Section 2B1.1 are not properly based on empirical evidence. On top of that, the Court should depart downward, or at least vary downward significantly, due to Ms. Boutros's mental and emotional conditions and/or diminished capacity.

> ### 1.   The Guidelines Range in This Case Is Inappropriate Because It Is Not Based on Empirical Evidence or National Experience and Fails to Promote the Purposes of Sentencing.

Although the Guidelines are one factor to consider under Section 3553(a), the Court should conclude that the Guideline sentence in this case, even under the plea agreement's proposed guideline range, is greater than necessary to accomplish the purposes of sentencing. Accordingly, the Guideline sentence is inappropriate even as a starting point.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(a)(13), (15) & (16). The original Commissioners, however, abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the

guidelines. *See* USSG, Ch. 1 Pt. A(3); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 15-18 (1988).

In *Rita v. United States*, 551 U.S. 338, 350 (2007), the United States Supreme Court stated that it may be "fair to assume," at least as a general matter, that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives" because (1) the original Commission used an "empirical approach," beginning "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past" and (2) the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50. The Court in *Rita* recognized, however, that *not all guidelines* were developed in this manner. *See Gall,* 552 U.S. at 46 n.2 (2007); *Kimbrough,* 552 U.S. at 96. When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, *even in a mine-run case.*" *Id.* at 109-10 (emphasis added).

Section 2B1.1, the guideline applicable to this case, is not based on empirical data of past practice or on national experience and, therefore, should not even be applied to the mine-run case. When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, *supra*, at 22-23. Unlike for most other offenses, "economic crime guidelines were ratcheted up in excess of . . . prior judicial sentencing data." Bennett, et al., *supra*, at 950. Before the Guidelines, the sentences for white-collar crimes were considerably lower than those for the substantially equivalent crime of larceny. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines*

44

*and Policy Statements* (1987), at 18.[14] The Commission "made a policy decision to adopt a guideline structure under which all white-collar crimes are treated essentially identically." *Id.* The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. A(4)(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) (the Guidelines were written to ensure that a larger portion of white collar offenders faced "short but definite period[s] of confinement").

The Commission's deterrence rationale, however, was not based on empirical evidence. The empirical research regarding white-collar offenders shows no difference between the deterrent effect of imprisonment and that of non-prison sanctions like probation. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587, 589 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Z. Gabbay, *supra*, 8 Cardozo J. Conflict Resol. 421, 448-49.

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just a few years after the Guidelines went into effect, offense levels for white collar economic crimes were increasing, resulting in a "draconian approach to white collar crime, unsupported by any empirical data." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). Whereas "with the initial guideline, the amount of the fraudulent loss

---

[14] Available at: http://www.src-project.org/wp-content/pdfs/reports/USSC_Supplementary%20Report.pdf.

could only increase the sentencing range fivefold—under the current fraud guidelines, that increase is nearly fortyfold." Bennett, *supra*, at 953. It has become so bad that federal judges have "referred to the fraud guidelines as 'a black stain on common sense'; 'patently unreasonable' and 'so run amok that they are patently absurd on their face'; 'of no help'; and both 'fundamentally flawed' and 'valueless.'" *Id.* at 974 (internal citations omitted).

Judge Rakoff has observed that, "while a typical fraud case in 1987 would produce a guideline range of 30 to 37 months, by 2003, that identical fraud case was ratcheted up to 151 to 188 months, a staggering increase of more than 500%." *Gupta*, 904 F. Supp. 2d at 351 ("Was such a crime really 500% worse in 2003 than it was in 1987?").

The effect of those increases over time on Ms. Boutros's case is been astounding. This astronomical increase in the Guidelines is observed by recalculating Ms. Boutros's Guidelines range under the 1987 and 1995 Guidelines:

**Ms. Boutros's Guidelines Range Under the 1987 Guidelines**

| | |
|---|---|
| 2B1.1(a) – base offense level | 4 |
| 2B1.1(b)(M) Loss amount over $2,000,000 | +12 |
| 2B1.1(b)(4) Offense involving more than minimal planning | +2 |
| **TOTAL OFFENSE LEVEL** | **18** |
| **GUIDELINE RANGE** | **27-33 months**[15] |

---

[15] If the actual loss of less than $1,500,000 were used, the total loss enhancement would be +11, the total offense level would be 17, and the Guidelines range would be 24-30 months.

**Ms. Boutros's Guidelines Sentence Under the 1995 Guidelines**

| | |
|---|---:|
| 2B1.1 – base offense level | 4 |
| 2B1.1(b)(1)(P) Loss amount more than $2,500,000 | +15 |
| 2B1.1(b)(4) Offense involving more than minimal planning | +2 |

| | |
|---|---:|
| **TOTAL OFFENSE LEVEL** | **21** |
| **GUIDELINE RANGE** | **37-46 months**[16] |

While Ms. Boutros fully acknowledges that each case is different and each sentence is based on its own unique facts and circumstances, it is respectfully submitted that even starting an analysis with the Guidelines would create an unwarranted disparity here.

> **2.** *The Court Should Grant a Downward Departure Pursuant to Section 5H1.3 and 5K2.13 of the Sentencing Guidelines.*

In addition, even if the Court were to vary downward to account for the general lack of empirical support in the Guidelines, which it should do in even the mine-run cases, it should depart further downward from that lower range in Ms. Boutros's case by granting a departure pursuant to USSG §§ 5H1.3 (Mental and Emotional Condition) and/or 5K2.13 (Diminished Capacity) due to Ms. Boutros's serious mental and emotional conditions that undoubtedly contributed substantially to her criminal conduct. "Congress . . . has allowed district courts to depart from the Guidelines to reflect 'mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines.'" *United States v. Leandre*, 132 F.3d 796, 800 (D.C. Cir. 1998).

The parties specifically carved out Sections 5H1.3 and 5K2.13 from the standard departure language of this District's plea agreements:

---

[16] If the actual loss of less than $1,500,000 were used, the total loss enhancement would be +14, the total offense level would be 20, and the Guidelines range would be 33-41 months.

> The parties agree that, solely for purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted *except that the parties agree that the defendant reserves the right to argue at sentencing for a downward departure pursuant to U.S.S.G. §§ 5H1.3 (Mental and Emotional Conditions) and 5K2.13 (Diminished Capacity)*, should the defendant's mental and/or emotional health be professionally evaluated between entry of the plea and sentencing. The government reserves the right to oppose either or both departures.

ECF No. 38 at 4 (emphasis added).

Dr. Boyd has provided relevant findings and opinions that support both departures, as discussed below.

> a)    *The Court Should Adopt a Downward Departure Under Section 5H1.3 Because Ms. Boutros's Mental and Emotional Conditions are Present to an Unusual Degree and Distinguish Her Case from Typical Cases.*

Ms. Boutros meets the criteria for a departure under U.S.S.G. § 5H1.3, which would specifically allow for the type of sentence that Ms. Boutros is requesting. Section 5H1.3 provides for a downward departure if a defendant's mental and emotional conditions, "individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3 ¶ 1. Moreover, Section 5H1.3 provides that "[i]n certain cases a downward departure may be appropriate to accomplish a specific treatment purpose." *Id.* ¶ 2. For example, "[m]ental and emotional conditions may be relevant in determining the conditions of probation or supervised release, e.g., participation in a mental health program . . . ." *Id.* ¶ 3.

The Probation Office has determined that, with respect to Ms. Boutros, her mental and emotional conditions are "not adequately considered within the guidelines." PSR at 29 ¶ 158. It finds that Ms. Boutros "has ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████" *Id.* ¶ 158. As a result, the Probation Department agrees that a downward departure under Section 5H1.3 is warranted and has recommended that the Court grant one.[17] ECF No. 46 at 1.

As reviewed, Ms. Boutros has submitted to a psychological evaluation in this case by Dr. Boyd. Relevant to the Court's determination as to whether a departure under Section 5H1.3 is appropriate, Dr. Boyd states in her report:



Ex. 1 at 19.

Dr. Boyd continues by explaining her concern that "incarceration potentially creates additional opportunities for traumatic stressor events, and limits Ms. Boutros's opportunity to engage in the intensity of treatment that she requires, at least until she returns to the community." Ex. 1 at 20. In consulting with Ms. Boutros's treating psychiatrist, Dr. Boyd reports that ████



---

[17] Although Ms. Boutros agrees with the Probation Department's recommendation of a downward departure, Ms. Boutros respectfully submits that the total recommended sentence of sixty-six months in prison is still an excessive sentence in this case that does not adequately address the purposes of such a departure or the Section 3553(a) factors in view of Ms. Boutros circumstances.



Ex. 1 at 20.

In explaining her agreement with Dr. Thielman regarding the insufficiency of care Ms. Boutros is likely to receive in prison, Dr. Boyd explains:

Ex. 1 at 20-21.

Ms. Morris, Ms. Boutros's divorce consultant, has added that Tricia "needs very good support to recover from the abusive marriage and divorce she has experienced. She has worked hard on her sobriety even under extreme duress. Her ability to move forward depends, in my professional coaching opinion, upon her having                        Ex. 23 at 1.

> b)   *The Court Should Adopt a Downward Departure Under Section 5K2.13 Because Ms. Boutros's Significantly Reduced Mental Capacity Contributed Substantially to the Commission of the Offense.*

Ms. Boutros also meets the criteria for a downward departure under Section 5K2.13. Section 5K2.13 provides for a downward departure "if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." "Significantly reduced mental capacity" means that "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or

to exercise the power of reason; or (B) control behavior that the defendant knows wrongful." U.S.S.G. § 5K2.13, Application Note 1.

"'[D]iminished capacity' departures pursuant to § 5K2.13 are a subset of departures allowed under § 5H1.3 based on mental and emotional conditions." *United States v. Sheehan*, 371 F.3d 1213,1218 (10th Cir. 2004). Diminished mental capacity is an "encouraged" factor for departure. "Such a disability, in the Commission's view, 'would normally warrant a downward departure.'" *United States v. Leandre*, 132 F.3d 796, 800 (D.C. Cir. 1998) (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)).

The Court of Appeals has previously explained the rationale of Section 5K2.13. "[T]he point of section 5K2.13 is to treat with lenity those individuals whose 'reduced mental capacity' contributed to commission of a crime. Such lenity is appropriate in part because . . . two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity.'" *United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993).

Ms. Boutros committed the offense while suffering from a reduced mental capacity because she had "a significantly impaired ability to . . . (B) control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13 Appl. Note 1. In other words, a departure is warranted under the "volitional aspect of § 5K2.13," rather than an inability to understand wrongfulness, based on the "commonly understood principle that mental illness is as often manifested in an inability to *control* behavior a person realizes is wrongful, as it is manifested in an inability to grasp the wrongfulness of the behavior." *United States v. Schneider*, 429 F.3d 888, 891 (9th Cir. 2005) (Ferguson, J., concurring in the judgment) (emphasis in original).

Dr. Boyd explains:

> Concerning the issue of whether or not Ms. Boutros had a significantly impaired ability to control behavior that she knew was wrongful, ███████

Ex. 1 at 21.[18]

Ms. Boutros's history also supports a conclusion that she was "significantly impaired by her mental disorder" during her criminal conduct. *Id.* This includes the "absence of any alleged similar criminal conduct prior to 2016," and the "correspondence in timing between ███ ██████████████████████████████ and the onset of criminal conduct." *Id.* The start of her criminal conduct is also "associated with significantly increased internal and external stressors for Ms. Boutros, due to her divorce/custody situation and associated financial demands . . ." *Id.*

As Dr. Boyd explains, Ms. Boutros's loss of access to her children played a major factor in exacerbating the mental and emotional conditions that, in turn, contributed to her offense:

---

[18] Dr. Boyd explains further: 

Ex. 1 at 20-21.



Ex. 1 at 13.

Ms. Boutros recognizes that the Probation Office has stated its view that this departure does not apply to Ms. Boutros, stating that defendant's history shows that "she has voluntarily misused multiple prescription medications on numerous instances in the past, including during the commission of the instant offense." PSR at 29 ¶159 (citing § 5K2.13 ¶ 2). In so stating, however, the defense submits that the Probation Office has misapplied the standard.

Section 5K2.13 does not state that a defendant is ineligible for the departure if he or she abuses drugs *during* the commission of the offense. Rather, under the plain language of the Guidelines, the Court should perform a two-part inquiry. First, the Court must determine whether a significantly reduced mental capacity contributed substantially to the commission of the offense. The Probation Office has not disputed this prong in the PSR. Second, the Court must determine whether such significantly reduced mental capacity "*was caused by* the voluntary use of drugs or other intoxicants."

Dr. Boyd explains that "intoxication would not substantially account for the type of symptoms she exhibited at the time of the instant offense":



Ex. 1 at 21.

Noting that Ms. Boutros was likely  Dr. Boyd concludes:

*Id.*

### F.    The Need to Provide Restitution

In the plea agreement, the government and Ms. Boutros agreed that restitution in this case should be between $1.3 million and $2.2 million. Despite engaging in good-faith negotiations over several weeks, the parties have been unable to reach agreement on an appropriate restitution amount in this case.

Ms. Boutros based her acceptance of the $1.3-million restitution floor on her agreement with the government's proffer prior to signing the plea agreement that the following victims suffered the following corresponding losses totaling $1,212,044.50:

| Institution | Loss |
|---|---|
| ▮▮▮▮ | $598,964.50 |
| ▮▮▮ | $381,405.00 |
| ▮▮▮ | $186,270.00 |
| ▮▮▮▮ | $45,405.00 |
| **Total** | **$1,212,044.50** |

Most recently, in its comments to the draft PSR, the government informed Ms. Boutros and the Probation Office that ▮▮▮▮ recently came forward and corrected its claim, stating

that it was able to offset the full $45,405 with other money it held on behalf of Ms. Boutros. Moreover, the government lowered its proffered loss amounts for ███ to $378,405, bringing the total amount of restitution for these previously agreed victims to $1,162,639.50. Ms. Boutros does not contest restitution in these amounts for these victims. This is $137,360.50 lower than the agreed floor of $1.3 million. In accordance with her plea agreement, Ms. Boutros agrees that $1,300,000 is owed, but the parties have not agreed on the allocation of this difference to any particular victim.

Ms. Boutros expects that the government will assert in its sentencing memorandum that Ms. Boutros owes a total of $2.2 million in restitution, in accordance with the ceiling for restitution in the plea agreement. With respect to the difference of $900,000 between what the government seeks and the amount Ms. Boutros agrees to repay, Ms. Boutros respectfully submits that, at least based on the evidence proffered by the government during negotiations,[19] the government will be unable to make the requisite showing under the MVRA that these alleged victims were "directly and proximately harmed as a result of the commission of" the offense by Ms. Boutros. 18 U.S.C. § 3663(a)(2). The government bears the "burden of demonstrating the amount of the loss sustained by the victim as a result of the offense." 18 U.S.C. § 3664(e). *See also Robers v. United States*, 572 U.S. 639, 645 (2014). Given this burden, Ms. Boutros will respond to any argument or evidence the government brings forth.

## III.    FORFEITURE

Similar to restitution, the parties agreed in the plea agreement that Ms. Boutros would forfeit proceeds pursuant to 18 U.S.C. § 982(a)(2)(A) in an amount between $1.3 million and $2.2 million. *See* ECF No. 38 at 8. The parties further agreed that the Court may enter a money

---

[19] The government has informed undersigned counsel that it has provided all information that it will offer to prove restitution.

judgment in an amount within this range that represents the proceeds of the offense, less the value of certain assets listed on page nine of the plea agreement. Specifically, Ms. Boutros has agreed to forfeit $496,054.41 in cash from six different financial accounts, along with the proceeds from the sale of a 2018 VolvoXC60, as proceeds of her criminal activity.

As with restitution, despite the parties good-faith negotiations to reach agreement on forfeiture, they have been unable to agree. Ms. Boutros based her agreement to the floor of $1.3 million (before deducting the value of seized assets) on the same amounts discuss above with respect to restitution.

Under Section 982(a)(2)(A), Ms. Boutros is required to forfeit to the United States "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." As with restitution, the government bears the burden to establish amounts for forfeiture. *See United States v. Dickerson*, 909 F.3d 118, 129-30 (5th Cir. 2018). The government must also "establish[] the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1). Accordingly, as with restitution, Ms. Boutros will respond to any argument or evidence the government brings forth.

## IV.    FINANCIAL ABILITY TO PAY A FINE

Ms. Boutros submits that she has demonstrated an inability to pay a fine under 18 U.S.C. § 1344 and U.S.S.G. §§ 5E1.2(c)(3) and (c)(4). The Probation Office has recommended against assessing a fine. *See* ECF No. 46 at 1.

## V.    CONCLUSION

At the time of Ms. Boutros's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101. This bedrock principle of sentencing law cannot be fulfilled in Ms. Boutros's case if she is sentenced within or near the proposed by the Guidelines sentence range. Rather, as

demonstrated above, a sentence of supervised release with significant period not exceeding twelve months to be served under home detention is more appropriate in this case.

Respectfully submitted,

DATED:  September 16, 2020

*/s/ William E. Zapf*
William E. Zapf (D.C. Bar No. 987213)
Jonathan Jeffress (D.C. Bar No. 479074)
KaiserDillon PLLC
1099 14th Street NW
8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
wzapf@kaiserdillon.com

*Attorneys for Tricia Steele Boutros*