IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIM NO. 20–cr–00082-APM |
| ) | |
| TRICIA STEELE BOUTROS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT TRICIA STEELE BOUTROS'S
REPLY MEMORANDUM IN AID OF SENTENCING**

Tricia Steele Boutros, by and through her attorneys, submits this memorandum responding to the government's Memorandum in Aid of Sentencing (ECF No. 52). This memorandum addresses the government's position on sentencing, as well as the government's requests with respect to forfeiture and restitution.

### A. A Sufficient Sentence

The government has requested a Guidelines sentence. Although this is not surprising, the Government has addressed only a few of the factors the Court must consider under 18 U.S.C. § 3553(a), while ignoring many mitigating circumstances. As one example, the government does not address Ms. Boutros's motives, which is critical to fashioning an appropriate sentence in this case. A fulsome consideration of all Section 3553(a) factors reveals that Ms. Boutros's case falls far outside the mine-run of cases contemplated by the Guidelines. Because Ms. Boutros has already provided a full analysis of the Section 3553(a) factors in her sentencing memorandum, ECF No. 54, the defense addresses only those factors addressed by the government below.

#### 1. *History and Characteristics of Ms. Boutros*

The government argues that Ms. Boutros's character and history actually support a sentence within the Guidelines range, rather than mitigate in favor of a variance. In doing so, the

government ignores Ms. Boutros's upbringing, strong family support, mental health issues, her struggle with addiction, divorce and custody proceedings that sent her into financial crisis and resulted in her losing all contact with her young children, as well as her thirty-seven years of life without any allegation of criminal conduct. The government ignores all of it.

The only aspect of Ms. Boutros's character and history the government addresses is her status as a lawyer. Ms. Boutros of course recognizes that being a lawyer comes with heightened expectations. And she deeply regrets that she did not uphold those standards. Indeed, for many years, Ms. Boutros upheld strict ethical standards as she worked on large multinational corporate transactions that provided plenty of opportunity for misconduct. Some clarification of the government's argument is needed, however. For example, the government points to Ms. Boutros's statements that her law license somehow gave her special access to sensitive background information, but those statements were obvious puffery.

### 2. *Nature and Circumstances of the Offense*

The government spends significant time reviewing Ms. Boutros's offense, including a sixteen-page declaration from FBI Agent Cassidy Smith. *See* ECF No. 54-1 (hereinafter, "Decl."). But, again, clarifications are needed.

For example, Ms. Boutros admits to working with Danial Jeloudar. ECF No. 39 at 2 ¶ 6. And she admitted to the FBI in May 2019 that she had arranged with Jeloudar to provide cryptocurrency to him in exchange for him paying her debts. It should be noted, however, that she did not know Mr. Jeloudar's true identity when she first encountered him on a cryptocurrency exchange. Moreover, Ms. Boutros entered into this arrangement only after Mr.

Jeloudar (using an alias) defrauded her out of cryptocurrency and she tried to recover what he had taken through this trading arrangement.[1]

Next, while Ms. Boutros fully recognizes the non-pecuniary harm to a person's sense of security that may have resulted from her criminal conduct, the government goes too far. The government argues that "[t]he defendant's identity theft victims . . . could face ongoing harm for years to come." ECF No. 52 at 3. To be clear, Ms. Boutros obtained bank account information and log-in credentials from others. She herself did not, for example, steal a database of identity information. To the extent that victims face ongoing identity theft issues going forward, those issues were set into motion elsewhere and by others.

The government also makes vague assertions several times in its memorandum that Ms. Boutros's fraudulent activity continued after her October 2019 arrest. *See, e.g.*, ECF No. 52 at 1, 2, 3, 10-11. To the extent that the government is referencing the Court's revocation of Ms. Boutros's pretrial release in December 2019, the government specifically declined to pursue revocation based on alleged fraudulent activity. *See* ECF No. 24 at 1-2. In any event, four-and-a-half months of pretrial detention during the COVID-19 pandemic ended with Ms. Boutros's guilty plea and her taking full responsibility for her conduct.[2]

Finally, Agent Smith states that the government has identified approximately 202 individuals and 51 financial institutions "affected" by Ms. Boutros's conduct. Decl. at 4 ¶ 9. Agent Smith has provided no details regarding who these individuals and institutions are, how

---

[1] As described in the Statement of Offense, Ms. Boutros admits that she eventually obtained bank account information from Mr. Jeloudar and did learn his true identity. ECF No. 39 at 2 ¶ 6.
[2] Toward the end of Agent Smith's declaration, she discusses discovery of alleged fraudulent transfers of cryptocurrency involving an account with Coin Café. Decl. at 15-17 ¶ 48. To be clear, the defense understands that those transactions—for which Ms. Boutros is accepting responsibility, as discussed below—occurred in 2018, long before her arrest.

they were allegedly "affected," or the government's basis for such assertions. As discussed below in the context of forfeiture and restitution, the defense believes that the government may be overreaching with respect to the scope of Ms. Boutros's activity.

### 3. *Deterrence*

With respect to general deterrence, as reviewed in Ms. Boutros's sentencing memorandum, studies have shown that, while the certainty of punishment is an important deterrent factor for white-collar defendants, the *length of incarceration* is not. ECF No. 54 at 34-36. Indeed, for many white-collar defendants, like Ms. Boutros, simply being caught, convicted, suffering public humiliation, loss of reputation—frankly, a complete loss of everything they have worked so hard for—is sufficient punishment to deter such conduct.

### 4. *Downward Departures*

The government argues against a downward departure for Ms. Boutros, but its reasoning fails to address the core issue. First, neither the Probation Office nor the defense has suggested that the Court should depart downward because Ms. Boutros is a suicide risk if imprisoned. It is unclear why the government focuses on this issue. ECF No. 52 at 5. Nor has anyone suggested that such a departure is applicable because of "sentencing-induced anxiety or depression." *Id*.

With respect to Section 5K2.13, the government states, without support or elaboration, that Ms. Boutros's diminished capacity "was caused by the voluntary use of drugs or other intoxicants." *Id*. Dr. Boyd has provided her professional opinion regarding the coexistence of addiction and the contribution of Ms. Boutros's mental health to the offense conduct. *See* ECF No. 54 at 50-54 & Ex. 1. The Court should credit Dr. Boyd's reasoned opinions, rather than the government's conclusory statement.

The government also argues that Section 5K2.13 does not apply to Ms. Boutros because her scheme was complex. In so doing, the government appears to misconstrue the parameters of

4

the departure. "Diminished capacity," in the context of Section 5K2.13, does not mean that the defendant is necessarily incapable of complex thought and action. Rather, as stated clearly in the commentary, "significantly reduced mental capacity" includes an "impaired ability to . . . control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13 Appl. Note 1.

B. **Restitution and Forfeiture**

The government is requesting $2,195,022.77 in restitution and forfeiture in relation to seventeen victims and a catch-all category of nearly $700,000 that it labels as "Additional JPMorgan Bank Intrusions."[3] As reviewed in Ms. Boutros's sentencing memorandum, she has already agree that she is responsible for $1.3 million in actual loss. This includes the losses of Blue Pay, BB&T, and Plooto, which total approximately $1,162,639.50. ECF No. 54 at 54-55. In addition to losses of Blue Pay, BB&T, and Plooto, Ms. Boutros agreed to restitution and forfeit of an additional $137,360.50 in unspecified losses to get to the total of $1.3 million. *Id.*

Based on new information provided by the government only recently, Ms. Boutros agrees to be responsible in restitution and forfeiture for $31,675 in loss claimed by Coin Café. As discussed below, Ms. Boutros also agrees to pay forfeiture and restitution with respect to victim P.C., another recently disclosed victim, in the amount of $42,000. These amounts, however, do not exceed the unspecified losses of $137,360.50 to which Ms. Boutros has already agreed and should not added to the $1.3 million total.

With respect to the remainder of the government's requests, while Ms. Boutros wishes to take full responsibility for her criminal conduct, Ms. Boutros is unable to take responsibility for

---

[3] Agent Smith states in her declaration that Bill.com suffered a loss of $225,228.90. Decl. at 6 ¶ 15. Although Ms. Boutros admitted in the Statement of Offense that she *attempted* transfers through Bill.com exceeding this amount, she did not admit and denies that she obtained or benefited from that amount and Agent Smith has provided no further support to show that restitution or forfeiture would be proper for this amount.

the amounts requested based on her own knowledge and recollection of events and the information the government has provided. For this reason, the defense respectfully maintains that the government has not met its burden with respect to the additional amounts. Specifically, for restitution, the government has not shown, with respect to these particular alleged victims and for these particular transactions, that Ms. Boutros was the direct and proximate cause of any harm suffered. *See* 18 U.S.C. § 3663A(a)(2). With respect to forfeiture, the government has failed to show that the amounts sought represent "proceeds" Ms. Boutros "obtained directly or indirectly, as the result of" her offense. *See* 18 U.S.C. § 982(a)(2)(A).

There are two main shortcomings that run throughout the government's requests. First and foremost, the government repeatedly fails to tie the specific transactions to Ms. Boutros.[4] In some cases, Ms. Boutros admits responsibility for at least attempting certain transactions based on their characteristics (e.g., a transfer to a specific bank or account) or her memory but denies responsibility for other transactions involving the same victim. In this respect, the Court should keep in mind that Ms. Boutros merely obtained account information from third parties. Those third parties, of course, could—and most likely did—provide that same information to others who may have engaged in fraud or used it themselves. JPMC, for example, was the victim of the one of the largest corporate security breaches in history in 2014.[5] Agent Smith highlights that Mr. Jeloudar, from whom Ms. Boutros obtained bank account information, has been indicted in an unrelated case for "conspiring to obtain, distribute, and use unauthorized credit card numbers and other personal identifies to obtain goods and services in the United States by fraud."

---

[4] The government, for example, could provide evidence showing the funds arriving and being maintained in the destination account and link the destination account to Ms. Boutros to show her control of the funds. It has not done so in nearly all cases.
[5] https://www.usatoday.com/story/tech/2014/10/02/jp-morgan-security-breach/16590689/.

Second, Ms. Boutros admits that she accessed a large number of accounts and *attempted* to transfer money from them, but she maintains that, in nearly all instances—and especially with respect to JPMC—she repeatedly failed to obtain control of the money. As shown by the terms of the plea agreement, the government and Ms. Boutros agree that she *attempted* many more fraudulent transactions (at least $3.5 million) than she successfully made ($1.3-$2.2 million). In nearly all cases other than that ACH transactions for which she has already agreed to provide restitution and forfeiture (Blue Pay, BB&T, and Plooto), Ms. Boutros maintains that the transactions either did not go through, were reversed back, and/or were frozen at the destination institution before she was able to access any funds. In some cases, those reversals are shown on the bank statements of the source accounts provided by the government, the accounts from which money was allegedly taken. In one case, the government has even provided a statement of a destination account (a "drop account") allegedly controlled by Ms. Boutros showing that the money JPMC is claiming was lost was, in fact, reversed back (i.e., not lost). In still other cases, Ms. Boutros believes that the funds may have been frozen at the destination account institution, and could even still be there today if they have not been reversed back. For this reason, the defense asserts that the government should be required to show the funds reaching and being maintained in an account shown to be controlled by Ms. Boutros. It has not done so.

        1.     *H.S. (JPMC)*

For H.S., Agent Smith points to a bank statement highlighting five transactions totaling $11,189.38, yet she claims that JPMC suffered a loss of $19,433. *See* Decl. at 4 ¶ 10 & Attachment A4. Ms. Boutros has admitted in the Statement of Offense that she caused four checks totaling $14,200 to be issued from H.S.'s account, *see* ECF No. 39 at 5 ¶ 16.c., but those transactions were reversed and the amounts were not retained. The government's Attachment A4

appears to highlight five new transactions, but the full bank statement the government provided in discovery, shows that each of the highlighted transactions was reversed. *See* Ex. 1.

### 2.     H.S.G. (JPMC)

For H.S.G., Agent Smith simply states that "[u]nauthorized ACH and other transfers also resulted in a loss of $52,296.95 to JPMC resulting from monies withdrawn." Decl. at 4 ¶ 11 & Attachment A6. Agent Smith makes no meaningful attempt to show that Ms. Boutros is responsible for the withdrawals. In addition, numerous highlighted transactions show as reversed on the same statement. *See, e.g.*, Attachment A6 at 4 (304) (Oct. 27, 2017 reversals).

### 3.     P.C. (JPMC)

Ms. Boutros has no recollection of these transactions and the defense submits that the government has not carried its burden. In any event, given P.C.'s circumstances, Ms. Boutros will not contest forfeiture and restitution for P.C.'s losses.

### 4.     *Seven Other Alleged JPMC Victims*

For seven alleged JPMC victims, with amounts totaling close to $260,000, Agent Smith has provided a summary table of losses on page 5 of her Declaration and included highlighted bank statements at Attachment A7. Each alleged victim is addressed in turn.

#### a)     A.E. and H.E.

For A.E. and H.E., Agent Smith has highlighted transactions totaling approximately $105,025 (lower than the total of $118,000 in the declaration). The descriptions for these transactions include Veem, Wav*Steele Legal, "Www.Steelmounta," and Paypal. Ms. Boutros admits she attempted the transactions for Wav*Steele Legal and "Www.Steelmounta" but not the others. In addition, several of the transactions totaling $33,150 show as reversed. *See* Decl. Attachment A7 at 43-44 (51-52). Ms. Boutros recalls that she did not obtain any funds from A.E. and H.E. that were not reversed or frozen.

b)     E.S.

For E.S., it is unclear which transactions in the bank statements in Attachment A7 it believes are included in the $12,150 it claims. In any event, Ms. Boutros admits that she attempted the highlighted transactions, except for the one described as "Lynx Investment," which she does not recognize. However, two of the transactions are shown to be reversed in the statements the government has provided. *See* Decl. Attachment A7 at 10 (159) & 13 (101). Ms. Boutros recalls being unsuccessful in retaining any funds from E.S.

c)     M.A.

For M.A., the government claims restitution and forfeiture of $5,837.12 but has highlighted various check transactions totaling $9,295.75, all of which show as being reversed. Ms. Boutros admits that she attempted these transactions, but she recalls never obtaining control of the money and believes they were, in fact, reversed.

d)     S.S.

For S.S., Agent Smith has highlighted transactions with the terms Edfinancial, "Gov Money Tran," and Paypal. Ms. Boutros denies that the transactions described as "Gov Money Tran" and "Paypal" were her. As shown in the statements provided, all of these transactions were reversed on December 5, 2017.

e)     Y.X.

For Y.X., Agent Smith has highlighted numerous transactions with various descriptions, including Goldman Sachs, Gemini Trust, Discover Bank, Coincafe, "Aplos Womens Tru," Ent CU, and Wav*Joshua Ryan. Ms. Boutros takes responsibility for the attempts relating to "Aplos Women's Tru" and Discover but not the remainder, and Ms. Boutros recalls not retaining any

funds taken from Y.X. Agent Smith has not linked the remaining transactions to Ms. Boutros or shown that Ms. Boutros obtained these amounts.[6]

    f)  S.D.

For S.D., Agent Smith has included bank statements showing transactions with descriptions including Venmo, Chase Card (three different accounts), and Keybank, all but one of which (a $911.92 payment to Chase Card ending 7466) is shown as being reversed in the same bank statements. Ms. Boutros admits that she attempted the transaction involving Key Bank (later reversed). *See* Decl. Attachment A7 at 40 (549). Agent Smith has provided no information linking the remaining transactions to Ms. Boutros.

    g)  I.H.T.W.

Agent Smith has provided no further evidence with respect to losses related to I.H.T.W. other than citing the Statement of Offense. ECF No. 39 at 6 ¶ 18.b. Although Ms. Boutros agrees that she accessed I.H.T.W.'s account and initiated ACH transfers of $4,500 and $7,500, she disagrees that she obtained the full amount of $30,748.29 and the government has provided no evidence sufficient to support the contrary.

   5.  **A.S.**

Agent Smith states that JPMC suffered a loss of $7,024 when Ms. Boutros transferred the funds from A.S.'s JPMC account to a fraudulent drop account at Goldman Sachs. Decl. at 7 ¶ 19. Ms. Boutros accepts responsibility for these *attempted* transfers. Unlike for many other claimed losses, for A.S., Agent Smith attaches a statement from the *destination* account at Goldman Sachs. *See* Attachment A14. This Goldman Sachs statement, however, shows definitively that the amounts transferred from JPMC to Goldman Sachs were reversed and, therefore, no loss

---

[6] In addition, some of the transactions show as being reversed. *See, e.g.*, Decl. Attachment A7 at 37 (119).

could have been suffered by JPMC. This claim illustrates well why the government should not be permitted to rely simply on JPMC account statements without showing that the funds were retained in destination accounts controlled by Ms. Boutros.

### 6. N.D.

For N.D., Agent Smith states that an account was opened in N.D.'s name and used to conduct transactions without N.D.'s consent. Decl. at 8 ¶ 22. Ms. Boutros admits that this was a drop account she opened in N.D.'s name. In other words, it was not N.D.'s real account with N.D.'s funds. The government attaches a bank statement for this drop account as support for a loss of $5,727, but it has provided no evidence that the monies in this account were fraudulently obtained or that they represent a loss incurred by N.D. or anyone else.[7]

### 7. R.J.

For R.J., Agent Smith states that she has attached a bank statement for R.J., but Attachment A21 includes only copies of two checks for $275 and $350, respectively. Ms. Boutros recalls that she tried to deposit these checks into a PNC account that she controlled but they were frozen and never retained. There is no further support for the remaining amount.

### 8. *Unspecified JPMC Losses*

The biggest difference between the government's request of $2.2 million and Ms. Boutros's agreed restitution and forfeiture of $1.3 million is $683,159.66 in "Additional JPMorgan Bank Intrusions." *See* ECF No. 52 at 7; Decl. at 14-15 ¶¶ 42-45. The government describes this amount as "losses not otherwise accounted for by the specific victim accounts discussed in the declaration." ECF No. 52 at 7 & n.3. The defense's best understanding is that these appear to be losses JPMC has discovered that may be associated with certain customers

---

[7] The forfeiture claim in the Information seeks forfeiture of only proceeds obtained by Ms. Boutros as a result of the offense, under 18 U.S.C. § 982(a)(2)(A). ECF No. 36 at 5-6.

whose information the government alleges Ms. Boutros may have possessed or with whose accounts Ms. Boutros may have associated with at some point. In sum, it does not appear that the government has shown or even contends that Ms. Boutros actually obtained these amounts or was the direct and proximate cause of these losses.

In a circuitous fashion, the government attempts to paint Ms. Boutros as responsible for these losses through a series of purported links. First, the government claims that it sent JPMC a "schedule of accounts that were either directly connected to BOUTROS or that were associated with her in some material way during the course of the investigation." Decl. at 14 ¶ 43. It is unclear what the government means by the accounts being either "directly connected to" or "associated with" Ms. Boutros. It is also unclear if these are JPMC accounts or accounts at other institutions. In any event, being "connected to" or "associated with" an account, without further information, is not sufficient to demonstrate that Ms. Boutros should be responsible in forfeiture and restitution for losses that might be connected to those accounts.

Second, it states that JPMC then "queried two of its systems ("CCS" and "LAW") and provided the government with a schedule depicting its losses on those accounts." *Id.* at 14 ¶ 43. "Those accounts" presumably refer to the accounts "connected to" or associated with" Ms. Boutros. This step apparently yielded total losses associated with these accounts of nearly $3 million. In other words, JPMC and the government have assigned all losses from accounts that were connected to or associated with Ms. Boutros in some unspecified manner, whether or not Ms. Boutros was responsible for the particular fraudulent transactions. The defense understands this to mean that there has been no analysis to determine if any specific fraudulent transactions were caused by Ms. Boutros.

Finally, the government then looked to see if Ms. Boutros had any personal identifying information for any of the victims, which narrowed the losses from $3 million to $683,159.66. *Id.* at 15 ¶ 45. Presumably, this is meant to show that Ms. Boutros had the technical information available to her to access some of these JPMC accounts that may have suffered fraud losses at some point. Still, the government has not shown that Ms. Boutros, in fact, accessed these accounts, or even that the personal identifying information Ms. Boutros had would have even worked, much less that she actually took the funds in a manner that would support forfeiture and restitution.

### 9. *Bank of America*

The government has included an email from Bank of America stating that it suffered a loss "resulting from fraudulent use of" and account in the name of "Tricia S Boutros." There is no further information provided as to what the alleged fraudulent use was, when it occurred, how the loss was incurred, where the money went, or how the account is tied to the defendant other than the name. Ms. Boutros recalls that in 2016 or 2017 she was the victim of fraud in relation to a Bank of America account in which transactions were reversed, and suspects that this letter may relate to those transactions, but she recalls no fraudulent transactions caused by her. In any event, the information proffered by the government is insufficient to hold Ms. Boutros responsible for any such alleged losses in forfeiture and restitution.

\*     \*     \*

For the reasons stated above and those stated in Ms. Boutros's sentencing memorandum, as well as the full information provided to the Court in this case, Ms. Boutros respectfully requests a sentence of time-served plus a period of home confinement with orders for forfeiture and restitution not to exceed $1.3 million, accounting for assets already forfeited.

        Respectfully submitted,

DATED:  September 21, 2020        */s/ William E. Zapf*
        William E. Zapf (D.C. Bar No. 987213)
        Jonathan Jeffress (D.C. Bar No. 479074)
        KaiserDillon PLLC
        1099 14th Street NW
        8th Floor West
        Washington, DC 20005
        T: (202) 640-2850
        F: (202) 280-1034
        wzapf@kaiserdillon.com

        *Attorneys for Tricia Steele Boutros*